Filed 3/17/15: pub. order 4/10/15 (see end of opn.); reposted 5/22/15 to attach opn. as modified 3/19/15

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Adoption of EMILIO G., a Minor. | |
| OSCAR G., et al. Plaintiffs and Respondents, v. ANDREW L., Defendant and Appellant. | A141319 (San Francisco County Super. Ct. No. FAD-13-022788) |

**INTRODUCTION**

Andrew L. (Andrew) is the biological father of Emilio G. who was born in July 2013. Katherine O. (Katherine) is Emilio's biological mother. Andrew and Katherine never married. Katherine became pregnant with Emilio a few months after she and Andrew began dating in August 2012. Their relationship was not smooth. By April 2013, Andrew and Katherine had broken up, with Andrew confirming the break up by text message to Katherine.

Late in her pregnancy, Katherine moved forward with a plan to arrange for Emilio's adoption. She sought to have Emilio adopted by petitioners Oscar and Tisha G. (the G.'s) in San Francisco. The G.'s filed a petition to terminate the parental rights of Andrew. After a two-day trial, the court found that although Andrew was Emilio's biological father, he had not established that he was Emilio's presumed father within the meaning of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*), with the attendant

right to withhold his consent to Emilio's adoption by the G.'s. Having made the finding that Andrew was not a *Kelsey S.* father, the court then considered whether it would be in Emilio's best interests to terminate Andrew's parental rights. The court concluded it would be. Andrew now appeals. We conclude that substantial evidence supports the court's finding that Andrew is not a *Kelsey S.* father, and that the court did not abuse its discretion in terminating Andrew's parental rights. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Emilio was born in July 2013 in Los Angeles, California. His biological father is Andrew L.; his biological mother is Katherine O.[1]

Andrew and Katherine's dating relationship began in early August 2012. Katherine became pregnant in October 2012.[2] Even before Katherine became pregnant, she was aware that Andrew could be violent and unpredictable. In September 2012, he yelled at and pushed Katherine's mother.[3] Around that same time, Andrew pled guilty to possession of metal knuckles and trespassing and was put on probation.

After Katherine became pregnant, several incidents occurred that confirmed her belief that Andrew could be violent and unpredictable. During an argument in mid-October, Andrew pushed Katherine against the door to his bedroom and into the hallway, where she fell down. Katherine felt scared. No one had ever pushed her before. When, as a result of this incident, Andrew lost his housing, he told Katherine that this was all her

---

[1] The trial court made detailed findings in its statement of decision, and explicitly noted that "[i]n making these findings, the court finds the testimony of Katherine [] credible, and the testimony of Andrew [] not credible, to the extent that their testimony conflicts." The trial court elaborated with examples, which we will discuss below. Therefore, our summary of the facts adopts Katherine's version of an event where Andrew's version differs from hers.

[2] Katherine went to a clinic and got official confirmation of her pregnancy on November 29, 2012. She was not surprised since it was obvious to her in October that she was pregnant.

[3] Katherine's mother testified that she observed Andrew to be a controlling person, and very aggressive and dominating toward her daughter. Katherine's mother had never known her daughter to be scared until she met Andrew.

fault and then kicked a dent into one of the doors of her car. Afterwards, he "took over" Katherine's car. This was a great hardship to Katherine and her mother and sister, who depended on the car for school, work, and dropping off children at day care. Until February 2013, when he stopped using Katherine's car, Andrew lived in Katherine's car off and on.[4] Katherine continued to make $260 monthly car payments and pay her insurance premiums during this period that he had control of her car, and Andrew did not reimburse her.

In November 2012, Andrew and Katherine went shopping for a "promise ring." Andrew's credit was denied at the jewelry store because of $400 in prior unpaid jewelry purchases for another woman, so Katherine put the ring on her own credit card. Shortly thereafter, on November 22, 2012, Andrew asked Katherine to marry him. She found the proposal, which took place in front of an arcade, embarrassing, but hesitantly said yes. She did not tell anyone at first, and ultimately only told three people.

A serious incident between Katherine and Andrew occurred on November 29, 2012. Katherine and Andrew had an argument sitting in her parked car. The argument got violent, and when Katherine (who was pregnant) tried to leave the car, Andrew, as she put it, "reached to my arm and he pulled me from my shirt, to the point that my bra and my shirt ripped." She tried to take the keys out of the ignition, and in the ensuing struggle Andrew scratched her arm with the car key. Andrew, who had been drinking beer, drove away with Katherine still in the car. When they got to a red light, Katherine tried to leave the car again. Her first reaction was to try to get away from Andrew because she already knew that when he got mad he "gets very violent" and "really aggressive." Andrew pulled her back, then turned illegally on a red light and hit another car. Andrew demanded that Katherine switch seats and take responsibility for the accident. He was on probation, did not have a driver's license, had been drinking, and

---

[4] At trial, Andrew admitted that he had lied in his deposition when he denied being homeless and living in Katherine's car.

was scheduled to go back to jail the following day to serve the rest of a sentence. Although she resisted, ultimately Katherine agreed to switch places.

At the trial on the petition to terminate Andrew's parental rights, Peggy Gonzales, who witnessed the incident, corroborated Katherine's account. She testified that she could hear Andrew yelling and screaming at Katherine, even though the car windows were rolled up, and saw him hitting Katherine. Gonzales was ready to get out of her truck and tell him to stop when Andrew took off in the car. She then saw Andrew hit a car and switch seats with Katherine. Gonzales waited at the scene and told police that Andrew had been driving, not Katherine, and that Andrew and Katherine had been fighting in the car before the accident. Another percipient witness testified at the trial that he saw the collision and saw Andrew make Katherine switch places and sit in the driver's seat.[5]

Katherine felt scared after the accident, and upset that Andrew had wrecked her car. She wanted to go home and rest because she had to work later that night. She did not consider asking for a restraining order at that time "[b]ecause I was afraid of his reaction if he were to find out I did something against him. . . ."[6]

Andrew also tried to isolate Katherine from her friends. He told them to stay away from her and pressured Katherine to deactivate her Facebook and Instagram accounts. During an argument in late November or early December, Andrew took Katherine's iPhone away from her and cracked the screen, telling her this was a consequence for not doing what he told her to do. Andrew then held onto Katherine's phone and told her to wait in the car while he visited his mother at her place of work. After a while, Katherine got out of the car to use the bathroom, and left a note as to her

---

[5] At trial, Andrew denied that he asked Katherine to change places with him. The trial court, however, expressly found that Andrew's testimony was not credible to the extent it conflicted with Katherine's.

[6] Katherine saw Andrew smoke marijuana "every day." He told her he smoked because it relieved his aggressiveness. Katherine bought marijuana for Andrew in October or November because he didn't have money and she wanted to "save myself from arguments and some problems" and "save myself from having to deal with him."

whereabouts. By the time she got back to the car, Andrew had broken her phone in half, claiming he hadn't seen her note. He told her that he thought she had left him, and he broke the phone as a way of hurting her.

At this point, Katherine started walking away, intending to walk the two blocks to her place of work and get a ride home from there. Andrew walked behind her and kept saying "[y]ou're not leaving. You're going to stay with me." Andrew then took Katherine's eyeglasses, which she needed in order to see. Andrew told her "[l]et's see how far you can get without your glasses. Let's see how you can get home now, since you can't see." Although Katherine kept asking him to give her the eyeglasses, he refused. She relented ("[s]o I have to give in"), and ultimately went home with him for the night. He did not return her glasses until the next day.

Eventually Andrew bought Katherine a prepaid phone so she could not hide from him or have an excuse not to be in touch with him. Katherine testified that it was a "way of having me on check." Andrew continued to use the phone incident as a cautionary threat: "if I didn't listen to him, he always remembers, 'See what happened with your phone for not listening? You want something else happening?' "

Andrew denied breaking Katherine's phone. He testified that her phone was "weird, because I dropped it in water. . . . And subsequently, two days later, I dropped mine in a soda, so—and I said, My bad, like when I get more money like I will get you that." This supposedly happened when he was driving her car. The trial court did not believe that Andrew did not break the telephone.

Andrew would also park in front of the drive-through window at Katherine's workplace (a fast food restaurant) and watch her during her shift to see who she was with and what she was doing.

Katherine, who had two children already, began to consider adoption in early January 2013, and began to initiate a breakup in February. Katherine did not believe she could depend on Andrew during her pregnancy, financially or otherwise. Katherine first raised the subject of adoption with Andrew in the middle of February. When she did so, he became aggressive and upset and refused to discuss it. When Katherine brought the

subject of adoption up again in March, Andrew again became aggressive and refused to acknowledge the possibility of adoption or that their relationship was at an end. In April, Andrew showed up at the restaurant where Katherine worked, and when she told him to leave, Andrew challenged the assistant manager to a fight. A week later, Katherine met with an adoption social worker and told her that she wanted to place the child for adoption.

On April 30, 2013, Andrew texted Katherine that he was breaking up with her because, as he testified at trial, "she was very ungrateful and unappreciative."

On May 14, 2013, Katherine served Andrew with an application for a domestic violence restraining order.[7] The request was based on four incidents.[8] One was the November 29, 2012, argument in the car we have already described. Another occurred on April 18, 2013, when Andrew told Katherine over the phone " 'if we don't see each other, I'll go looking for each one of your friends, and I'll get rid of them.' " Katherine also described an incident in April when Andrew threatened Katherine's manager with a fight and an incident in which Andrew pushed Katherine's mother.

The application for a restraining order was heard on May 23, 2013. At the hearing, Katherine testified regarding these incidents, which Andrew then denied. The court found Katherine credible and concluded that Andrew had made a threat against Katherine and committed domestic violence against her. The court issued a restraining order as to Katherine, to last for three months. The court also told Andrew that he was not prevented from contacting Katherine's mother, and if he wished to be present at the birth, he could petition the court for permission to be present. Andrew took neither of these actions.

---

[7] A couple of weeks earlier, Katherine had attempted to obtain a temporary restraining order against Andrew on an ex parte application without notice. That request was denied, and the court set a hearing for May 23, 2013, to consider the request.

[8] The trial court took judicial notice of the records related to this application, including the transcript of the hearing on Katherine's request for a restraining order.

Andrew's involvement in Katherine's medical care was minimal.  Only once, on November 29, 2012, when Katherine learned she was pregnant, did Andrew actually attend a doctor's visit.  He was also present when Katherine had an ultrasound in early January 2013.  However, when he went to doctor's appointments in February, he stayed for only 10 minutes in the waiting room.  He never went in with Katherine and met her doctor.  This was also the case for all of Katherine's remaining visits until the restraining order was issued, which precluded Andrew from being with Katherine.

Throughout her pregnancy, Katherine worked 32 hours per week.  She was "desperate" for money and would not have refused any support from Andrew.  During the first trimester of Katherine's pregnancy, Andrew was not working,[9] and he did not give Katherine any money for expenses related to the pregnancy.  In December 2012, when Andrew was released from jail after serving a sentence for his plea to possession of metal knuckles and trespassing, Katherine asked him to get a job.  She was concerned that he did not have a place to stay and was still using her car.  Andrew did not get a job for several months and continued to live in her car.  During this period, he would drive her car from place to place, or sleep throughout the day.  She bought him food and sometimes sneaked food out of her mother's house for him.  Sometimes she would sneak Andrew into her mother's house so he could shower.  Andrew never gave Katherine any money to give to her mother for rent or food.

Andrew started working in February 2013, but gave Katherine no financial support in the second trimester.  In Katherine's third trimester, Andrew gave her two cashier's checks, one for $20 and one for $10.  He paid $40 for some medicine she needed, and bought her some pants, a maternity belt, cream, a small pack of sanitary pads, as well as two small packs of diapers for her youngest daughter.  Katherine estimated that these items were worth around $100.  He also brought her a bib, a onesie, and newborn diapers.

---

[9] Andrew had been employed at Taco Bell, but on October 15, 2012, he was fired for harassing other employees and for insubordination.

A few times he brought her cookies, an ice cream, and bags of chips. He brought flowers to her work in April for Easter and in May on Mother's Day.

After Andrew broke up with Katherine by text message, they had no communication with the exception of the flowers on Mother's Day, until Andrew was served with Katherine's petition for the restraining order on May 14, 2013. After the court issued the restraining order, Andrew provided no further financial support to Katherine and had no contact with her.

On May 23, 2013, Andrew was served with formal notice of the upcoming adoption in a document entitled "Notice of Alleged Paternity." On July 2, 2013, before Emilio was born, Andrew filed an action for custody in Los Angeles. He also filed a notice of paternity. The Los Angeles County Superior Court denied Andrew's request because it did not have jurisdiction over an unborn child.

Emilio was born in July 2013. Three days after his birth, Katherine relinquished him to the adoption agency, and he was then placed with the G.'s. That same day, the G.'s filed an agency adoption request, and in Los Angeles County, Andrew filed an application for custody and visitation. On July 24, 2013, the G.'s filed a petition to terminate Andrew's parental rights in San Francisco County Superior Court. On July 25, 2013, the Los Angeles County Superior Court denied Andrew's custody application and stayed the matter pending the outcome of the adoption case.

Between the time of Emilio's birth and January 7, 2014, Andrew saw Emilio twice. The G.'s never denied his requests to visit Emilio. His sole support for the child was formula that he obtained from a governmental assistance program and some rice cereal. The formula was useful, but the baby was not yet eating solid food.

The trial on the petition to terminate Andrew's parental rights was held on January 7 and 8, 2014. The court issued a detailed statement of decision and, as noted above, found Katherine's testimony credible and Andrew's not credible where their testimony was in conflict.

The trial court found that Andrew had failed to establish that his commitment to fatherhood was sufficient to establish him as a *Kelsey S*. father. Specifically, the trial

court found that before the child's birth, although Andrew acknowledged the child was his, "he failed to promptly assume or attempt to assume his parental responsibilities as fully as the mother allowed and his circumstances permitted. [¶] . . . Financially, he did not contribute his share of the expenses commensurate with his ability to do so. While [Katherine] worked 32 hours a week during her pregnancy, [Andrew] did not work for quite some time during the pregnancy, and did not present any evidence why he did not seek employment. [¶] . . . [Andrew] used [Katherine] to supply him with food and a car in which he slept and which he used as a means to monitor her whereabouts, causing her to nearly lose her job. [¶] . . . The small amount of money he gave her left her to bear the entire financial responsibility of the pregnancy. [¶] . . . [Andrew] did even less to support [Katherine] emotionally during her pregnancy than he did to support her financially during that period of time. He was emotionally abusive of her, and she was terrified of him during the pregnancy. She waited for a break when he went back to jail as a relief from the emotional abuse she was suffering. [¶] . . . [Andrew] took her car away for several months, without regard to her needs, and he broke her phone, and replaced it with one over which he exerted control. [¶] . . . [Andrew] committed domestic violence against [Katherine], causing slight injury to her. [¶] . . . [Andrew] attempted to make [Katherine] take the blame and responsibility in an auto accident which he caused after using alcohol and while she was a passenger. He failed to take responsibility for the accident he caused. [¶] . . . [Andrew] claimed that he went with [Katherine] to prenatal visits, but [Katherine's] testimony was more credible than [Andrew's] when she testified that [Andrew] made only cameo appearances by staying for 10 minutes at the doctor's visits and then rushing off to his job."

The trial court also found that Andrew's actions after Emilio's birth were not sufficient to establish that he should receive rights as a *Kelsey S.* parent: "[Andrew] claimed to have provided financial support for the child, but the only evidence he offered was that he purchased baby food on public assistance that he stocked up in his own home after the birth and was never given to the baby except in token amounts. [¶] . . . [Andrew] made excuses for only visiting with the child two times in the child's entire

five months of life, but the evidence showed that he was never refused a visit by [the G.'s] . . . [¶] [Andrew's] legal actions in Los Angeles to seek custody of the child were part of a continuation of harassment and emotional abuse of [Katherine], in that he took actions such as requesting mediation in a case which he knew the Los Angeles court had stayed jurisdiction, and scheduling hearings at times when he knew [Katherine] was in labor or about to be in labor." Andrew also "claimed that he had tried to set up a savings account for the child, but under cross-examination admitted that he did not."

The trial court evaluated the credibility of the witnesses, finding Katherine credible and Andrew not credible where their testimony differed. Further, the trial court explicitly found certain instances where Andrew was not credible: when he denied he had a problem with alcohol, when he denied that he was inebriated at San Francisco Airport on November 16, 2013, two days before the last pre-trial hearing, despite the fact that there was credible evidence that he was in fact inebriated;[10] and when he claimed that he had tried to set up a savings account for the child, but admitted on cross-examination he had not.

The court also concluded that Andrew had not carried his burden of proof that blocking the adoption was in Emilio's best interest.

On February 25, 2014, a judgment terminating Andrew's parental rights was entered. This timely appeal followed.

**DISCUSSION**

A.     *Andrew's Kelsey S. Status*

Andrew argues that the trial court erred in denying him *Kelsey S.* status. We disagree.

---

[10] On his way to a visit with Emilio and a court appearance, Andrew ordered seven 22-ounce beers at San Francisco Airport which he drank over the course of about five hours. He spent almost $70.00 This was actually the money he had budgeted towards a motel room that night. At trial he admitted in response to questioning that "[l]ooking at it now" he "could have" used the money he spent on the beer to give to the G.'s to provide something for the baby.

As Emilio's unmarried biological father, Andrew could not intervene in his adoption unless he qualified as Emilio's presumed father either statutorily under Family Code sections 7610-7612, 8604[11] or non-statutorily under paternal rights established by *Kelsey S., supra*, 1 Cal.4th 816. There is no dispute that Andrew does not have statutory presumed father status. Therefore, he may only intervene in the adoption if he can meet his burden to show that he qualifies as a *Kelsey S.* father.

In *Kelsey S.*, our Supreme Court held that a biological father, who is not married to the child's mother and "has no statutory right to block a third party adoption by withholding consent may nevertheless have a constitutional right to do so under the due process and equal protection clauses of the Fourteenth Amendment and thereby to preserve his opportunity to develop a parental relationship with his child.' " (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1052 (*Michael H.*).) Therefore, " '[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his paternal relationship absent a showing of his unfitness as a parent.' [Citation.] . . . 'Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and the circumstances permit.' [Citation.]" (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 719-720.) The commitment the father shows must be as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted "within a short time after he discovered or reasonably should have discovered that the biological mother was pregnant with his child." (*Michael H., supra,* at p. 1054.) The father must demonstrate " 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' " (*Kelsey S., supra*, 1 Cal.4th at p. 849.)

Andrew had the burden as the biological parent to establish the facts to support his claim for *Kelsey S.* rights. (*Adoption of A.S.* (2012) 212 Cal.App.4th 188, 209.) We

---

[11] All further statutory references are to the Family Code, unless otherwise noted.

apply the substantial evidence test in our review of the trial court's findings of facts as to whether Andrew met his burden. (*Arthur M., supra,* 149 Cal.App.4th at p. 717.) To the extent this issue is a mixed question of law and fact, we "exercise [our] independent judgment in measuring [the] facts against [the applicable] legal standard." (*Id.* at pp. 717-718.)

"When determining whether substantial evidence is present, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or determine where the preponderance of the evidence lies. [Citation.] We merely determine if there is any substantial evidence, contradicted or not, which will support the conclusion of the trier of fact. [Citation.] Substantial evidence is 'reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged . . . .' (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401.) The appellant must show the evidence is insufficient to support the trial court's findings." (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.) [12]

Substantial evidence supports the trial court's findings that Andrew did not meet his burden of showing that he is a *Kelsey S.* parent. Not only was Andrew not emotionally supportive of Katherine during her pregnancy, his actions were actually harmful to her. During the November 29, 2012, incident in the parked car, Andrew yelled at Katherine, grabbed her and tore her clothing. Katherine was scratched in the altercation. In a number of troubling ways, Andrew attempted to control and isolate Katherine: he broke her cell phone, took and withheld her eyeglasses, threatened her shift manager at work, threatened her friends in an effort to keep them away from her and pressured her to stop communicating with her friends by attempting to restrict her use of social media. He threatened her with future consequences if she didn't listen to him. He damaged her car and blamed her for causing him to be kicked out of his apartment.

---

[12] In his reply brief, Andrew contends that a case cited by Katherine, *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, puts forward a version of the substantial evidence standard of review that is incorrect. We need not address this issue, because we do not rely on that case for our articulation of the standard of review.

Although it has been noted that *Kelsey S.* and its progeny do not require the biological father to "love or dote on the mother, propose marriage to her, or be a compatible mate," it is required "that he provide care and support for the mother's physical and emotional health to the extent it affects the health and welfare of the child she is carrying." (*Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 452 fn. 13 (*Baby Boy W.*)) It hardly needs to be pointed out that Andrew's actions were not the actions of an emotionally supportive father. Substantial evidence supports the trial court's finding that Katherine suffered emotional abuse and domestic violence from Andrew, which undermined his effort to establish his status as a *Kelsey S.* father.

Further, Andrew was, at best, a reluctant participant in Katherine's prenatal care. In the period of time before the domestic violence restraining order was issued, Andrew met Katherine's doctor only once, and was present at the ultrasound after Katherine's pregnancy was established. However, at every subsequent medical appointment, Andrew either stayed in the waiting room for 10 minutes or was absent. Although Andrew explained that he had to work during these appointments, Katherine testified that Andrew knew about the appointments in advance and could have changed his work schedule. Andrew was not present at the child's birth or at the hospital after the baby was born, although the Los Angeles Superior Court informed him at the time the restraining order was issued that he could petition the court to make a showing that he was entitled to be there.

With regard to financial support, Andrew gave Katherine no financial support during the first trimester of her pregnancy. As described above, he was a financial drain on Katherine. Further, after Andrew got into a car accident on November 29, 2012, Katherine paid the $500 deductible on the insurance. Although Andrew repaid Katherine in February or March 2013, this was not an expense Katherine should have been required to shoulder at a time she was "desperate" for money.

A biological father's responsibility to financially support the mother is a responsibility that must be considered in light of what support the mother permitted the father to render, and what support his circumstances allowed. (*Arthur M., supra,* 149

Cal.App.4th at pp. 719-720.) Andrew suggests that his minimal financial support of Katherine must be considered in light of the fact that he was unemployed and underemployed during her pregnancy. On the contrary, the circumstances that led to Andrew's failure to provide any financial support during the first trimester and providing very little during the remaining two, were circumstances of Andrew's own making. In particular, Andrew was unemployed for a time as a result of his own actions in the workplace that led to his termination, and, as the trial court found, he offered no evidence as to why he did not seek employment immediately after he was terminated.

Andrew, on the other hand, argues that a number of actions he took during and after the pregnancy support a finding that he was a *Kelsey S.* father. Although some of these actions, such as attending a parenting class after Emilio was born, were commendable, under the substantial evidence standard of review, we "affirm the order even if there is other evidence supporting a contrary finding." (*Baby Boy W., supra,* 232 Cal.App.4th at p. 453.)

Andrew further contends that what he characterizes as a "relentless" pursuit of his parental rights is evidence of his commitment to fatherhood sufficient to have warranted a *Kelsey S.* finding. The G.'s, on the other hand, point out that the trial court found that Andrew's "legal actions in Los Angeles to seek custody of the child were part of a continuation of harassment and emotional abuse of [Katherine], in that he took actions such as requesting mediation in a case which he knew the Los Angeles court had stayed jurisdiction, and scheduled hearings at times when he knew [Katherine] was in labor or about to be in labor." We need not, however, determine whether Andrew's actions were harassment or an appropriate pursuit of his parental rights. As the *Baby Boy W.* court observes, it is not enough to simply file and pursue a legal proceeding; the biological father must establish an "unequivocal commitment to his parental responsibilities" both before and after the child's birth. (*Baby Boy W., supra,* 232 Cal.App.4th at p. 452.) Here, the considerable evidence of Andrew's emotional and physical mistreatment of Katherine, his failure to participate in her medical care, and his lack of financial support during the pregnancy, all establish that Andrew did not show this "unequivocal

commitment." In addition, substantial evidence supported the trial court's conclusion that the situation did not change after Emilio was born and in the custody of the G.'s. At this point, Andrew could no longer claim that Katherine or the domestic violence restraining order were excuses. As of the time of the trial, Andrew had visited Emilio only twice during the first five months of Emilio's life, gave the G.'s some formula and rice cereal, and claimed to have stocked up on baby food at his home.

Andrew also relies on a number of cases involving biological fathers who were denied *Kelsey S.* status, and attempts to contrast his situation with theirs. Although they are not identical to the matter before us, each underlines the ways in which a father, including Andrew, can fail to attain this status and, rather than supporting Andrew's argument that the court erred in denying him *Kelsey S.* status, undercuts it.

In *Adoption of O.M.* (2008) 169 Cal.App.4th 672, the father failed to provide the mother with material support during the pregnancy while he was incarcerated and, when he was released, the mother avoided contact with him. The court held that these impediments were either of the father's own making, or played a small role in the father's actions. The court emphasized that the father was responsible for demonstrating his commitment to fatherhood in these circumstances and had failed to do so. Although Andrew points to his failure to find full employment and Katherine's decision to seek a restraining order as standing in the way of his efforts to attain *Kelsey S.* status, these matters were within his own control, just as similar impediments were in the control of the father in *Adoption of O.M.*

In another case Andrew cites, *Adoption of A.S., supra,* 212 Cal.App.4th 188, the father, who was 16 years old, was unemployed and dependent on his mother for financial support and therefore unable to provide financial support to the mother. The court did not, however, look primarily to these facts in its *Kelsey S.* finding. Rather, the court emphasized the " 'complete absence' of evidence" that the father communicated to the mother "his willingness to support her emotionally or financially, or his commitment to raising his child," as well as the fact that father had not made a " 'significant effort[]' . . . to 'assume the mantle of responsibility for being a father.' " According to the court,

father's " 'laissez faire attitude' " was " 'very unusual' for a father who 'really wants to have his child and raise his child in his care.' " (*Id.* at p. 210.) As with *Adoption of O.M.,* this situation involves a different scenario than that before us. The basic point, however, remains the same: a father must demonstrate early on his commitment to parenthood. Andrew, like the father in *Adoption of A.S.,* failed to do so.

*Adoption of Myah M., supra,* 201 Cal.App.4th 1518 involved parents who were not "able or willing to take immediate custody" of their child two years after the grandparents had been granted guardianship of the child. The father was denied *Kelsey S.* status solely on that ground, his parental rights were terminated, and the adoption by the grandparents was permitted to proceed. (*Id.* at p. 1540.) Here, the trial court relied on a variety of factors in reaching its conclusion. *Myah M.,* therefore, is factually inapposite, and of no assistance to Andrew.

Andrew also relies on a case in which the court affirmed a *Kelsey S.* finding, *Adoption of H.R.* (2012) 205 Cal.App.4th 455 (*H.R.*) and attempts to draw an analogy between himself and the father in that case. In *H.R.*, the trial court found father was a *Kelsey S.* father for a variety of reasons. The father participated, as far as the mother would allow, during prenatal care. He attempted to marry mother; their relationship was terminated by mother, who then blocked father from receiving any information on the yet-unborn minor. "Father almost immediately sought the court's protection by filing an action to determine paternity and by obtaining DNA testing. . . . [¶] Father tried to live with mother and planned on marrying her. They moved together to a two-bedroom apartment." (*Id*. at p. 468.) Father furnished a room with a crib and changing table even though the child lived with the mother. The evidence was uncontested that father maintained contact with the child as often as permitted, and that he and the child had actually bonded. (*Ibid.*) On these facts, the court found that there was substantial evidence to support the trial judge's conclusion that father met the standards of a *Kelsey S.* father. Here, in contrast, Andrew did not pursue his parental responsibilities to the extent the father in *H.R.* did. His attendance at prenatal visits was perfunctory at best, his

actions toward Katherine were harmful, and he did not diligently pursue his parental rights.

The *H.R.* court also concluded that the alleged negative behavior of the father[13] did not prevent it from finding substantial evidence to support the trial court's judgment. The court pointed out that "[Father] never abandoned minor or waived his parental rights. He had no current drug, alcohol, or criminal conduct. While the trial court found father was controlling and domineering and viewed women as possessions, it made no factual findings of *any* hint of intended violence toward minor, and no factual findings of any actual violence toward mother. Tellingly, mother was unable to obtain a restraining order. Further, there was no evidence of *any* inappropriate behavior toward minor." (*H.R., supra,* 205 Cal.App.4th at pp. 469-470.) Further, in *H.R.*, the request for the restraining order had been denied for insufficient evidence and the court apparently disbelieved mother's testimony. (*Id.* at p. 459.) The situation here is quite different. There was considerable evidence that Andrew physically and emotionally abused Katherine, who did obtain a restraining order.

In an effort to dismiss the evidence that he was not emotionally supportive of Katherine, Andrew contends that Katherine "barely met her burden" when she obtained the domestic violence restraining order and the incidents on which the restraining order was based were "isolated." In such a situation, Andrew's remedy was to challenge the order on those grounds, something he did not do.

---

[13] For example, mother claimed father "engaged in angry outbursts, assaultive conduct, and sexually inappropriate conduct with a teenager." (*H.R., supra,* 205 Cal.App.4th at pp. 468-469.) The court was not persuaded that these actions undermined the substantial evidence supporting the trial court's finding regarding *Kelsey S.* status. The alleged "sexually inappropriate conduct" was the subject of testimony by mother's teenage daughter, who testified that father "once came in the computer room to thank her and kissed her neck; her response was 'ewww.' " (*Id.* at p. 468.) The mother's daughter also testified in response to a question from the trial court that she would support mother's position no matter what, and that her testimony was solely to support mother. The court found that the trial court did not rely on this evidence in its findings of fact; moreover, it did not appear that the trial court even credited this testimony. (*Id.* at p. 469.)

In his reply brief, Andrew relies on *Baby Boy W., supra,* 232 Cal.App.4th 438, a case in which the court found that substantial evidence supported the trial court's *Kelsey S.* finding based on numerous factors. Although Andrew contends that his behavior was similar to that of the *Baby Boy W.* father, he is incorrect. In *Baby Boy W.*, the court found that substantial evidence supported the trial court's *Kelsey S.* findings. Specifically, the father promptly attempted to assume parental responsibilities, and was willing and able to assume full custody of the child with the help of his family. The father moved across country to San Diego a week after learning of the child's birth and secured full time employment within a month after that. (*Id.* at p. 449.) He "provided adequate financial support commensurate with his ability to do so and with [mother's] need." (*Id.* at p. 456.) It was undisputed that the father took prompt legal action to secure paternity. He also offered sufficient emotional support to mother. (*Id.* at p. 461.) There was no evidence of violence or physical abuse. The mother "acknowledged that [father] never hit her, never threatened her, and never called her a bad name." (*Id.* at p. 460, fn. 19.) At most, mother testified that father yelled at her over the telephone when they argued about adoption. (*Ibid.*) Taken together, the facts in *Baby Boy W.* are wholly unlike the case before us, and led the trial court in that case to an entirely different conclusion that was supported by substantial evidence.

Andrew suggests that because the court in *Baby Boy W.* mentioned that the father unwittingly took certain actions that the mother found objectionable, Andrew's own good intentions in his actions toward Katherine should have been given some weight by the trial court. This argument is not persuasive. Contrary to Andrew's argument, the trial court in *Baby Boy W.* affirmatively stated in its findings that it treated the "issue of emotional support objectively." (*Baby Boy W., supra,* 232 Cal.App.4th at p. 458.) Further, the *Baby Boy W.* court did not announce a general rule that in considering a father's actions, a court should look solely to a father's motivations and intentions, but rather seemed to be observing that the father's sincerity and level of maturity had some bearing on the inferences the trial court drew about his actions. We will not disturb the trial court's findings here based on this argument.

**B.** *Best Interests Finding*

"Where a natural father does not have presumed father status under section 7611 or a constitutional right to block an adoption under *Kelsey S.*, ' "the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]" ' " (*Adoption of A.S., supra,* 212 Cal.App.4th at p. 215.)

Section 7664, subdivision (b) provides that if the biological father claims parental rights, "the court shall determine if it is in the best interest of the child that the biological father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the biological father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child."

Section 7664, subdivision (c) provides that "If the court finds that it is in the best interest of the child that the biological father should be allowed to retain his parental rights, the court shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the biological father, or that if he is the biological father it is in the child's best interest that an adoption be allowed to proceed, the court shall order that the consent of that man is not required for an adoption. This finding terminates all parental rights and responsibilities with respect to the child."

It was Andrew's burden to prove that Emilio's best interest would be served by permitting Andrew to retain his parental rights and not allow the adoption to proceed. (*Adoption of A.S.*, *supra*, 212 Cal.App.4th at p. 218.) "We must determine whether substantial evidence supported the trial courts findings and whether it abused its discretion in determining that it was in [the child's] best interests to terminate appellant's parental rights and proceed with the adoption." (*Id.* at p. 218.)

In reaching its decision that it was in Emilio's best interest to terminate Andrew's parental rights and allow the adoption to proceed, the trial court found that the adoptive parents "are loving parents with the capability to love and nurture Emilio and the ability to provide him a healthy childhood." The court relied on the observations of Dr.

Frederica Conrad, who "observed the interactions between the [G.'s.] and the child, and testified that the child is becoming attached to both parents, and that to remove Emilio from this loving couple would be harmful to Emilio." The court found that "[i]f the child were to be removed from the [G.'s], [Katherine] would seek custody of Emilio which would lead to a custody dispute between the parents, who have a previous domestic violence history and an uncomfortable relationship with each other, subjecting Emilio to tremendous stress." Finally, the court found that "[i]f Emilio stays in the home of the [G.'s], he will have access to both biological mother and father, while remaining in the care of two people who have demonstrated that they have the ability to care for and nurture Emilio."

Andrew does not appear to argue that these findings are not supported by substantial evidence.[14] Rather, he points to other evidence in the record of his suitability as a parent and contends that the court erred in concluding he had failed to meet his burden of showing that it would be in Emilio's best interests for him to retain his parental rights. He first asserts that he went to "extraordinary lengths" to obtain custody and loved his son and wanted to be a father to him. He also argues that any disruption to Emilio on moving him from the G.'s home could be avoided with a "smooth transition plan," and that one benefit of blocking the adoption would be the benefit to Emilio of being raised by his biological father. Andrew acknowledges the history between himself and Katherine but asserts that exposure to conflict could be minimized in the event he and Katherine have a custody dispute. Finally, he argues that the trial court should not have relied on the assertion of the G.'s that they would give both Katherine and Andrew access to Emilio.

---

[14] Andrew contends as an aside that the court was "premature" in stating that it would give more "credence" to the testimony of the psychologist who observed Emilio (Dr. Conrad) than that of the psychologist retained by Andrew (Dr. Singer) who did not observe Emilio because the court made this comment before hearing the testimony of Dr. Singer. He provides no authority that the court erred in making this observation. Further, there is no evidence that the court did not fully consider the testimony of witnesses in arriving at its conclusions.

We disagree that the trial court's discretionary decision should be disturbed for any of the reasons Andrew advances. With regard to his efforts to obtain custody, we note that the steps Andrew took occurred fairly late in a pregnancy he knew about much earlier. Of far more significance, however, is Andrew's attempt to minimize the conclusion of the G.'s expert witness, Dr. Conrad, an expert in attachment bonding and co-parenting. Dr. Conrad observed signs of bonding and attachment between Emilio and his adoptive parents, which she believed would continue. Dr. Conrad testified that the trauma of a move from the G.'s to another caretaker could be minimized. However, two important conditions under which that trauma could be minimized were not present here—namely a similarity between the G.'s and Andrew and the sensitivity and empathic response of Andrew to the child upon such a change. There is very little in the record to support Andrew's claim that he would provide the loving and supportive environment from which he proposes to remove Emilio. Andrew's history of emotional and physical abuse of Katherine, his criminal behavior, and failure to support Katherine emotionally or financially suggest the contrary would be the case. Similarly, Andrew dismisses the possibility that there will be any difficulty between himself and Katherine over custody of Emilio should the adoption not proceed. On this record, such a claim is untenable.

With regard to Andrew's argument that it was in Emilio's best interests to be raised by his biological father, this is only one of many factors a court may consider in making a discretionary decision regarding a child's best interests. (See *Adoption of A.S., supra,* 212 Cal.App.4th at p. 218.) It is not, however, the only factor, and on this record we cannot say that the trial court abused its discretion in giving it less weight than the considerable evidence that the adoption would be in Emilio's best interests and should be allowed to proceed.

Finally, we need not decide whether the trial court was precluded from considering the G.'s' expressed willingness to allow both Katherine and Andrew access to Emilio. Even if this factor was not one on which the court could rely, as Andrew argues, the trial court's decision was based on far more than this possibility.

In sum, the trial court court's findings of facts are supported by substantial evidence.  We find no basis for concluding that the trial court abused its discretion in reaching its decision.

**C.**     ***Oscar G.'s Presumed Father Status***

Andrew contends that the trial court improperly found that Emilio's adoptive father, Oscar G., qualified as his presumed father.  The court's statement of decision, however, explicitly states that "deciding whether or not [Oscar G.] is Emilio's presumed father . . . is not necessary . . . ."  Although the court went on to state that were it to be called on to determine whether Andrew or Oscar were Emilio's presumed father, Oscar would be the appropriate choice, this observation carried no weight in the court's ultimate decisions.  Accordingly, no error occurred.

**DISPOSITION**

The trial court's order is affirmed.  Respondents are awarded their costs on appeal.

 

 

 

 

                                     _____

                                       Miller, J.

We concur:

_____

Kline, P. J.

_____

Stewart, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Adoption of EMILIO G., a Minor.<br><br>OSCAR G., et al.<br><br>      Plaintiffs and Respondents,<br><br>v.<br><br>ANDREW L.,<br><br>      Defendant and Appellant. | A141319<br><br>(San Francisco County<br>Super. Ct. No. FAD-13-022788) |

BY THE COURT:

      The opinion in the above-entitled matter filed on March 17, 2015, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____             _____

                                                  Kline, P. J.

Trial Court:  Superior Court of San Francisco

Trial Judge:  Hon. Julie Tang


Attorney for defendant and-appellant          Valerie E. Sopher
                                              P. O. Box 1254
                                              El Cerrito, CA

                                              By appointment of the Court of Appeal
                                              under the First District Appellate
                                              Project's Independent Case System


Attorneys for plaintiffs and respondents      Marc Gradstein
                                              Jane A. Gorman
                                              Seth F. Gorman
                                              Law Office of Gradstein & Gorman
                                              80 Stone Pine Road, Suite 101
                                              Half Moon Bay, CA  94019

Filed 3/19/15  Adoption of Emilio G. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Adoption of EMILIO G., a Minor. | |
| OSCAR G., et al.<br><br>      Plaintiffs and Respondents,<br><br>v.<br><br>ANDREW L.,<br><br>      Defendant and Appellant. | A141319<br><br>(San Francisco County<br>Super. Ct. No. FAD-13-022788) |

BY THE COURT:

It is ordered that the opinion filed herein on March 17, 2015, be modified as follows:

In the Disposition on page 22, the last sentence, "Respondents are awarded their costs on appeal," is deleted.

This modification does not change the judgment.

Dated:_____                    _____
                                                                        Miller, Acting P. J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Adoption of EMILIO G., a Minor.<br><br>OSCAR G., et al.,<br>    Plaintiffs and Respondents,<br>v.<br>ANDREW L.,<br>    Defendant and Appellant. | A141319<br><br>(San Francisco County<br>Super. Ct. No. FAD-13-022788) |

**INTRODUCTION**

Andrew L. (Andrew) is the biological father of Emilio G. who was born in July 2013. Katherine O. (Katherine) is Emilio's biological mother. Andrew and Katherine never married. Katherine became pregnant with Emilio a few months after she and Andrew began dating in August 2012. Their relationship was not smooth. By April 2013, Andrew and Katherine had broken up, with Andrew confirming the break up by text message to Katherine.

Late in her pregnancy, Katherine moved forward with a plan to arrange for Emilio's adoption. She sought to have Emilio adopted by petitioners Oscar and Tisha G. (the G.'s) in San Francisco. The G.'s filed a petition to terminate the parental rights of Andrew. After a two-day trial, the court found that although Andrew was Emilio's biological father, he had not established that he was Emilio's presumed father within the meaning of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*), with the attendant

1

right to withhold his consent to Emilio's adoption by the G.'s.  Having made the finding that Andrew was not a *Kelsey S.* father, the court then considered whether it would be in Emilio's best interests to terminate Andrew's parental rights.  The court concluded it would be.  Andrew now appeals.  We conclude that substantial evidence supports the court's finding that Andrew is not a *Kelsey S.* father, and that the court did not abuse its discretion in terminating Andrew's parental rights.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Emilio was born in July 2013 in Los Angeles, California.  His biological father is Andrew L.; his biological mother is Katherine O.[1]

Andrew and Katherine's dating relationship began in early August 2012.  Katherine became pregnant in October 2012.[2]  Even before Katherine became pregnant, she was aware that Andrew could be violent and unpredictable.  In September 2012, he yelled at and pushed Katherine's mother.[3]  Around that same time,  Andrew pled guilty to possession of metal knuckles and trespassing and was put on probation.

After Katherine became pregnant, several incidents occurred that confirmed her belief that Andrew could be violent and unpredictable.  During an argument in mid-October, Andrew pushed Katherine against the door to his bedroom and into the hallway, where she fell down.  Katherine felt scared.  No one had ever pushed her before.  When, as a result of this incident, Andrew lost his housing, he told Katherine that this was all her

---

[1] The trial court made detailed findings in its statement of decision, and explicitly noted that "[i]n making these findings, the court finds the testimony of Katherine [] credible, and the testimony of Andrew [] not credible, to the extent that their testimony conflicts."  The trial court elaborated with examples, which we will discuss below.  Therefore, our summary of the facts adopts Katherine's version of an event where Andrew's version differs from hers.

[2] Katherine went to a clinic and got official confirmation of her pregnancy on November 29, 2012.  She was not surprised since it was obvious to her in October that she was pregnant.

[3] Katherine's mother testified that she observed Andrew to be a controlling person, and very aggressive and dominating toward her daughter.  Katherine's mother had never known her daughter to be scared until she met Andrew.

2

fault and then kicked a dent into one of the doors of her car. Afterwards, he "took over" Katherine's car. This was a great hardship to Katherine and her mother and sister, who depended on the car for school, work, and dropping off children at day care. Until February 2013, when he stopped using Katherine's car, Andrew lived in Katherine's car off and on.[4] Katherine continued to make $260 monthly car payments and pay her insurance premiums during this period that he had control of her car, and Andrew did not reimburse her.

In November 2012, Andrew and Katherine went shopping for a "promise ring." Andrew's credit was denied at the jewelry store because of $400 in prior unpaid jewelry purchases for another woman, so Katherine put the ring on her own credit card. Shortly thereafter, on November 22, 2012, Andrew asked Katherine to marry him. She found the proposal, which took place in front of an arcade, embarrassing, but hesitantly said yes. She did not tell anyone at first, and ultimately only told three people.

A serious incident between Katherine and Andrew occurred on November 29, 2012. Katherine and Andrew had an argument sitting in her parked car. The argument got violent, and when Katherine (who was pregnant) tried to leave the car, Andrew, as she put it, "reached to my arm and he pulled me from my shirt, to the point that my bra and my shirt ripped." She tried to take the keys out of the ignition, and in the ensuing struggle Andrew scratched her arm with the car key. Andrew, who had been drinking beer, drove away with Katherine still in the car. When they got to a red light, Katherine tried to leave the car again. Her first reaction was to try to get away from Andrew because she already knew that when he got mad he "gets very violent" and "really aggressive." Andrew pulled her back, then turned illegally on a red light and hit another car. Andrew demanded that Katherine switch seats and take responsibility for the accident. He was on probation, did not have a driver's license, had been drinking, and

---

[4] At trial, Andrew admitted that he had lied in his deposition when he denied being homeless and living in Katherine's car.

was scheduled to go back to jail the following day to serve the rest of a sentence. Although she resisted, ultimately Katherine agreed to switch places.

At the trial on the petition to terminate Andrew's parental rights, Peggy Gonzales, who witnessed the incident, corroborated Katherine's account. She testified that she could hear Andrew yelling and screaming at Katherine, even though the car windows were rolled up, and saw him hitting Katherine. Gonzales was ready to get out of her truck and tell him to stop when Andrew took off in the car. She then saw Andrew hit a car and switch seats with Katherine. Gonzales waited at the scene and told police that Andrew had been driving, not Katherine, and that Andrew and Katherine had been fighting in the car before the accident. Another percipient witness testified at the trial that he saw the collision and saw Andrew make Katherine switch places and sit in the driver's seat.[5]

Katherine felt scared after the accident, and upset that Andrew had wrecked her car. She wanted to go home and rest because she had to work later that night. She did not consider asking for a restraining order at that time "[b]ecause I was afraid of his reaction if he were to find out I did something against him. . . ."[6]

Andrew also tried to isolate Katherine from her friends. He told them to stay away from her and pressured Katherine to deactivate her Facebook and Instagram accounts. During an argument in late November or early December, Andrew took Katherine's iPhone away from her and cracked the screen, telling her this was a consequence for not doing what he told her to do. Andrew then held onto Katherine's phone and told her to wait in the car while he visited his mother at her place of work. After a while, Katherine got out of the car to use the bathroom, and left a note as to her

---

[5] At trial, Andrew denied that he asked Katherine to change places with him. The trial court, however, expressly found that Andrew's testimony was not credible to the extent it conflicted with Katherine's.

[6] Katherine saw Andrew smoke marijuana "every day." He told her he smoked because it relieved his aggressiveness. Katherine bought marijuana for Andrew in October or November because he didn't have money and she wanted to "save myself from arguments and some problems" and "save myself from having to deal with him."

4

whereabouts. By the time she got back to the car, Andrew had broken her phone in half, claiming he hadn't seen her note. He told her that he thought she had left him, and he broke the phone as a way of hurting her.

At this point, Katherine started walking away, intending to walk the two blocks to her place of work and get a ride home from there. Andrew walked behind her and kept saying "[y]ou're not leaving. You're going to stay with me." Andrew then took Katherine's eyeglasses, which she needed in order to see. Andrew told her "[l]et's see how far you can get without your glasses. Let's see how you can get home now, since you can't see." Although Katherine kept asking him to give her the eyeglasses, he refused. She relented ("[s]o I have to give in"), and ultimately went home with him for the night. He did not return her glasses until the next day.

Eventually Andrew bought Katherine a prepaid phone so she could not hide from him or have an excuse not to be in touch with him. Katherine testified that it was a "way of having me on check." Andrew continued to use the phone incident as a cautionary threat: "if I didn't listen to him, he always remembers, 'See what happened with your phone for not listening? You want something else happening?' "

Andrew denied breaking Katherine's phone. He testified that her phone was "weird, because I dropped it in water. . . . And subsequently, two days later, I dropped mine in a soda, so—and I said, My bad, like when I get more money like I will get you that." This supposedly happened when he was driving her car. The trial court did not believe that Andrew did not break the telephone.

Andrew would also park in front of the drive-through window at Katherine's workplace (a fast food restaurant) and watch her during her shift to see who she was with and what she was doing.

Katherine, who had two children already, began to consider adoption in early January 2013, and began to initiate a breakup in February. Katherine did not believe she could depend on Andrew during her pregnancy, financially or otherwise. Katherine first raised the subject of adoption with Andrew in the middle of February. When she did so, he became aggressive and upset and refused to discuss it. When Katherine brought the

subject of adoption up again in March, Andrew again became aggressive and refused to acknowledge the possibility of adoption or that their relationship was at an end. In April, Andrew showed up at the restaurant where Katherine worked, and when she told him to leave, Andrew challenged the assistant manager to a fight. A week later, Katherine met with an adoption social worker and told her that she wanted to place the child for adoption.

On April 30, 2013, Andrew texted Katherine that he was breaking up with her because, as he testified at trial, "she was very ungrateful and unappreciative."

On May 14, 2013, Katherine served Andrew with an application for a domestic violence restraining order.[7] The request was based on four incidents.[8] One was the November 29, 2012, argument in the car we have already described. Another occurred on April 18, 2013, when Andrew told Katherine over the phone " 'if we don't see each other, I'll go looking for each one of your friends, and I'll get rid of them.' " Katherine also described an incident in April when Andrew threatened Katherine's manager with a fight and an incident in which Andrew pushed Katherine's mother.

The application for a restraining order was heard on May 23, 2013. At the hearing, Katherine testified regarding these incidents, which Andrew then denied. The court found Katherine credible and concluded that Andrew had made a threat against Katherine and committed domestic violence against her. The court issued a restraining order as to Katherine, to last for three months. The court also told Andrew that he was not prevented from contacting Katherine's mother, and if he wished to be present at the birth, he could petition the court for permission to be present. Andrew took neither of these actions.

---

[7] A couple of weeks earlier, Katherine had attempted to obtain a temporary restraining order against Andrew on an ex parte application without notice. That request was denied, and the court set a hearing for May 23, 2013, to consider the request.

[8] The trial court took judicial notice of the records related to this application, including the transcript of the hearing on Katherine's request for a restraining order.

Andrew's involvement in Katherine's medical care was minimal. Only once, on November 29, 2012, when Katherine learned she was pregnant, did Andrew actually attend a doctor's visit. He was also present when Katherine had an ultrasound in early January 2013. However, when he went to doctor's appointments in February, he stayed for only 10 minutes in the waiting room. He never went in with Katherine and met her doctor. This was also the case for all of Katherine's remaining visits until the restraining order was issued, which precluded Andrew from being with Katherine.

Throughout her pregnancy, Katherine worked 32 hours per week. She was "desperate" for money and would not have refused any support from Andrew. During the first trimester of Katherine's pregnancy, Andrew was not working,[9] and he did not give Katherine any money for expenses related to the pregnancy. In December 2012, when Andrew was released from jail after serving a sentence for his plea to possession of metal knuckles and trespassing, Katherine asked him to get a job. She was concerned that he did not have a place to stay and was still using her car. Andrew did not get a job for several months and continued to live in her car. During this period, he would drive her car from place to place, or sleep throughout the day. She bought him food and sometimes sneaked food out of her mother's house for him. Sometimes she would sneak Andrew into her mother's house so he could shower. Andrew never gave Katherine any money to give to her mother for rent or food.

Andrew started working in February 2013, but gave Katherine no financial support in the second trimester. In Katherine's third trimester, Andrew gave her two cashier's checks, one for $20 and one for $10. He paid $40 for some medicine she needed, and bought her some pants, a maternity belt, cream, a small pack of sanitary pads, as well as two small packs of diapers for her youngest daughter. Katherine estimated that these items were worth around $100. He also brought her a bib, a onesie, and newborn diapers.

---

[9] Andrew had been employed at Taco Bell, but on October 15, 2012, he was fired for harassing other employees and for insubordination.

A few times he brought her cookies, an ice cream, and bags of chips. He brought flowers to her work in April for Easter and in May on Mother's Day.

After Andrew broke up with Katherine by text message, they had no communication with the exception of the flowers on Mother's Day, until Andrew was served with Katherine's petition for the restraining order on May 14, 2013. After the court issued the restraining order, Andrew provided no further financial support to Katherine and had no contact with her.

On May 23, 2013, Andrew was served with formal notice of the upcoming adoption in a document entitled "Notice of Alleged Paternity." On July 2, 2013, before Emilio was born, Andrew filed an action for custody in Los Angeles. He also filed a notice of paternity. The Los Angeles County Superior Court denied Andrew's request because it did not have jurisdiction over an unborn child.

Emilio was born in July 2013. Three days after his birth, Katherine relinquished him to the adoption agency, and he was then placed with the G.'s. That same day, the G.'s filed an agency adoption request, and in Los Angeles County, Andrew filed an application for custody and visitation. On July 24, 2013, the G.'s filed a petition to terminate Andrew's parental rights in San Francisco County Superior Court. On July 25, 2013, the Los Angeles County Superior Court denied Andrew's custody application and stayed the matter pending the outcome of the adoption case.

Between the time of Emilio's birth and January 7, 2014, Andrew saw Emilio twice. The G.'s never denied his requests to visit Emilio. His sole support for the child was formula that he obtained from a governmental assistance program and some rice cereal. The formula was useful, but the baby was not yet eating solid food.

The trial on the petition to terminate Andrew's parental rights was held on January 7 and 8, 2014. The court issued a detailed statement of decision and, as noted above, found Katherine's testimony credible and Andrew's not credible where their testimony was in conflict.

The trial court found that Andrew had failed to establish that his commitment to fatherhood was sufficient to establish him as a *Kelsey S.* father. Specifically, the trial

8

court found that before the child's birth, although Andrew acknowledged the child was his, "he failed to promptly assume or attempt to assume his parental responsibilities as fully as the mother allowed and his circumstances permitted. [¶] . . . Financially, he did not contribute his share of the expenses commensurate with his ability to do so. While [Katherine] worked 32 hours a week during her pregnancy, [Andrew] did not work for quite some time during the pregnancy, and did not present any evidence why he did not seek employment. [¶] . . . [Andrew] used [Katherine] to supply him with food and a car in which he slept and which he used as a means to monitor her whereabouts, causing her to nearly lose her job. [¶] . . . The small amount of money he gave her left her to bear the entire financial responsibility of the pregnancy. [¶] . . . [Andrew] did even less to support [Katherine] emotionally during her pregnancy than he did to support her financially during that period of time. He was emotionally abusive of her, and she was terrified of him during the pregnancy. She waited for a break when he went back to jail as a relief from the emotional abuse she was suffering. [¶] . . . [Andrew] took her car away for several months, without regard to her needs, and he broke her phone, and replaced it with one over which he exerted control. [¶] . . . [Andrew] committed domestic violence against [Katherine], causing slight injury to her. [¶] . . . [Andrew] attempted to make [Katherine] take the blame and responsibility in an auto accident which he caused after using alcohol and while she was a passenger. He failed to take responsibility for the accident he caused. [¶] . . . [Andrew] claimed that he went with [Katherine] to prenatal visits, but [Katherine's] testimony was more credible than [Andrew's] when she testified that [Andrew] made only cameo appearances by staying for 10 minutes at the doctor's visits and then rushing off to his job."

The trial court also found that Andrew's actions after Emilio's birth were not sufficient to establish that he should receive rights as a *Kelsey S.* parent: "[Andrew] claimed to have provided financial support for the child, but the only evidence he offered was that he purchased baby food on public assistance that he stocked up in his own home after the birth and was never given to the baby except in token amounts. [¶] . . . [Andrew] made excuses for only visiting with the child two times in the child's entire

9

five months of life, but the evidence showed that he was never refused a visit by [the G.'s] . . . [¶] [Andrew's] legal actions in Los Angeles to seek custody of the child were part of a continuation of harassment and emotional abuse of [Katherine], in that he took actions such as requesting mediation in a case which he knew the Los Angeles court had stayed jurisdiction, and scheduling hearings at times when he knew [Katherine] was in labor or about to be in labor." Andrew also "claimed that he had tried to set up a savings account for the child, but under cross-examination admitted that he did not."

The trial court evaluated the credibility of the witnesses, finding Katherine credible and Andrew not credible where their testimony differed. Further, the trial court explicitly found certain instances where Andrew was not credible: when he denied he had a problem with alcohol, when he denied that he was inebriated at San Francisco Airport on November 16, 2013, two days before the last pre-trial hearing, despite the fact that there was credible evidence that he was in fact inebriated;[10] and when he claimed that he had tried to set up a savings account for the child, but admitted on cross-examination he had not.

The court also concluded that Andrew had not carried his burden of proof that blocking the adoption was in Emilio's best interest.

On February 25, 2014, a judgment terminating Andrew's parental rights was entered. This timely appeal followed.

## DISCUSSION

### A.    *Andrew's Kelsey S. Status*

Andrew argues that the trial court erred in denying him *Kelsey S.* status. We disagree.

---

[10] On his way to a visit with Emilio and a court appearance, Andrew ordered seven 22-ounce beers at San Francisco Airport which he drank over the course of about five hours. He spent almost $70.00  This was actually the money he had budgeted towards a motel room that night. At trial he admitted in response to questioning that "[l]ooking at it now" he "could have" used the money he spent on the beer to give to the G.'s to provide something for the baby.

10

As Emilio's unmarried biological father, Andrew could not intervene in his adoption unless he qualified as Emilio's presumed father either statutorily under Family Code sections 7610-7612, 8604[11] or non-statutorily under paternal rights established by *Kelsey S., supra*, 1 Cal.4th 816. There is no dispute that Andrew does not have statutory presumed father status. Therefore, he may only intervene in the adoption if he can meet his burden to show that he qualifies as a *Kelsey S.* father.

In *Kelsey S.*, our Supreme Court held that a biological father, who is not married to the child's mother and "has no statutory right to block a third party adoption by withholding consent may nevertheless have a constitutional right to do so under the due process and equal protection clauses of the Fourteenth Amendment and thereby to preserve his opportunity to develop a parental relationship with his child.' " (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1052 (*Michael H.*).) Therefore, " '[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his paternal relationship absent a showing of his unfitness as a parent.' [Citation.] . . . 'Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and the circumstances permit.' [Citation.]" (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 719-720.) The commitment the father shows must be as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted "within a short time after he discovered or reasonably should have discovered that the biological mother was pregnant with his child." (*Michael H., supra,* at p. 1054.) The father must demonstrate " 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' " (*Kelsey S., supra*, 1 Cal.4th at p. 849.)

Andrew had the burden as the biological parent to establish the facts to support his claim for *Kelsey S.* rights. (*Adoption of A.S.* (2012) 212 Cal.App.4th 188, 209.) We

_____

[11] All further statutory references are to the Family Code, unless otherwise noted.

apply the substantial evidence test in our review of the trial court's findings of facts as to whether Andrew met his burden. (*Arthur M., supra,* 149 Cal.App.4th at p. 717.) To the extent this issue is a mixed question of law and fact, we "exercise [our] independent judgment in measuring [the] facts against [the applicable] legal standard." (*Id.* at pp. 717-718.)

"When determining whether substantial evidence is present, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or determine where the preponderance of the evidence lies. [Citation.] We merely determine if there is any substantial evidence, contradicted or not, which will support the conclusion of the trier of fact. [Citation.] Substantial evidence is 'reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged . . . .' (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401.) The appellant must show the evidence is insufficient to support the trial court's findings." (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.) [12]

Substantial evidence supports the trial court's findings that Andrew did not meet his burden of showing that he is a *Kelsey S.* parent. Not only was Andrew not emotionally supportive of Katherine during her pregnancy, his actions were actually harmful to her. During the November 29, 2012, incident in the parked car, Andrew yelled at Katherine, grabbed her and tore her clothing. Katherine was scratched in the altercation. In a number of troubling ways, Andrew attempted to control and isolate Katherine: he broke her cell phone, took and withheld her eyeglasses, threatened her shift manager at work, threatened her friends in an effort to keep them away from her and pressured her to stop communicating with her friends by attempting to restrict her use of social media. He threatened her with future consequences if she didn't listen to him. He damaged her car and blamed her for causing him to be kicked out of his apartment.

---

[12] In his reply brief, Andrew contends that a case cited by Katherine, *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, puts forward a version of the substantial evidence standard of review that is incorrect. We need not address this issue, because we do not rely on that case for our articulation of the standard of review.

Although it has been noted that *Kelsey S.* and its progeny do not require the biological father to "love or dote on the mother, propose marriage to her, or be a compatible mate," it is required "that he provide care and support for the mother's physical and emotional health to the extent it affects the health and welfare of the child she is carrying." (*Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 452 fn. 13 (*Baby Boy W.*)) It hardly needs to be pointed out that Andrew's actions were not the actions of an emotionally supportive father. Substantial evidence supports the trial court's finding that Katherine suffered emotional abuse and domestic violence from Andrew, which undermined his effort to establish his status as a *Kelsey S.* father.

Further, Andrew was, at best, a reluctant participant in Katherine's prenatal care. In the period of time before the domestic violence restraining order was issued, Andrew met Katherine's doctor only once, and was present at the ultrasound after Katherine's pregnancy was established. However, at every subsequent medical appointment, Andrew either stayed in the waiting room for 10 minutes or was absent. Although Andrew explained that he had to work during these appointments, Katherine testified that Andrew knew about the appointments in advance and could have changed his work schedule. Andrew was not present at the child's birth or at the hospital after the baby was born, although the Los Angeles Superior Court informed him at the time the restraining order was issued that he could petition the court to make a showing that he was entitled to be there.

With regard to financial support, Andrew gave Katherine no financial support during the first trimester of her pregnancy. As described above, he was a financial drain on Katherine. Further, after Andrew got into a car accident on November 29, 2012, Katherine paid the $500 deductible on the insurance. Although Andrew repaid Katherine in February or March 2013, this was not an expense Katherine should have been required to shoulder at a time she was "desperate" for money.

A biological father's responsibility to financially support the mother is a responsibility that must be considered in light of what support the mother permitted the father to render, and what support his circumstances allowed. (*Arthur M., supra,* 149

13

Cal.App.4th at pp. 719-720.) Andrew suggests that his minimal financial support of Katherine must be considered in light of the fact that he was unemployed and underemployed during her pregnancy. On the contrary, the circumstances that led to Andrew's failure to provide any financial support during the first trimester and providing very little during the remaining two, were circumstances of Andrew's own making. In particular, Andrew was unemployed for a time as a result of his own actions in the workplace that led to his termination, and, as the trial court found, he offered no evidence as to why he did not seek employment immediately after he was terminated.

Andrew, on the other hand, argues that a number of actions he took during and after the pregnancy support a finding that he was a *Kelsey S.* father. Although some of these actions, such as attending a parenting class after Emilio was born, were commendable, under the substantial evidence standard of review, we "affirm the order even if there is other evidence supporting a contrary finding." (*Baby Boy W., supra,* 232 Cal.App.4th at p. 453.)

Andrew further contends that what he characterizes as a "relentless" pursuit of his parental rights is evidence of his commitment to fatherhood sufficient to have warranted a *Kelsey S.* finding. The G.'s, on the other hand, point out that the trial court found that Andrew's "legal actions in Los Angeles to seek custody of the child were part of a continuation of harassment and emotional abuse of [Katherine], in that he took actions such as requesting mediation in a case which he knew the Los Angeles court had stayed jurisdiction, and scheduled hearings at times when he knew [Katherine] was in labor or about to be in labor." We need not, however, determine whether Andrew's actions were harassment or an appropriate pursuit of his parental rights. As the *Baby Boy W.* court observes, it is not enough to simply file and pursue a legal proceeding; the biological father must establish an "unequivocal commitment to his parental responsibilities" both before and after the child's birth. (*Baby Boy W., supra,* 232 Cal.App.4th at p. 452.) Here, the considerable evidence of Andrew's emotional and physical mistreatment of Katherine, his failure to participate in her medical care, and his lack of financial support during the pregnancy, all establish that Andrew did not show this "unequivocal

14

commitment." In addition, substantial evidence supported the trial court's conclusion that the situation did not change after Emilio was born and in the custody of the G.'s. At this point, Andrew could no longer claim that Katherine or the domestic violence restraining order were excuses. As of the time of the trial, Andrew had visited Emilio only twice during the first five months of Emilio's life, gave the G.'s some formula and rice cereal, and claimed to have stocked up on baby food at his home.

Andrew also relies on a number of cases involving biological fathers who were denied *Kelsey S.* status, and attempts to contrast his situation with theirs. Although they are not identical to the matter before us, each underlines the ways in which a father, including Andrew, can fail to attain this status and, rather than supporting Andrew's argument that the court erred in denying him *Kelsey S.* status, undercuts it.

In *Adoption of O.M.* (2008) 169 Cal.App.4th 672, the father failed to provide the mother with material support during the pregnancy while he was incarcerated and, when he was released, the mother avoided contact with him. The court held that these impediments were either of the father's own making, or played a small role in the father's actions. The court emphasized that the father was responsible for demonstrating his commitment to fatherhood in these circumstances and had failed to do so. Although Andrew points to his failure to find full employment and Katherine's decision to seek a restraining order as standing in the way of his efforts to attain *Kelsey S.* status, these matters were within his own control, just as similar impediments were in the control of the father in *Adoption of O.M.*

In another case Andrew cites, *Adoption of A.S., supra,* 212 Cal.App.4th 188, the father, who was 16 years old, was unemployed and dependent on his mother for financial support and therefore unable to provide financial support to the mother. The court did not, however, look primarily to these facts in its *Kelsey S.* finding. Rather, the court emphasized the " 'complete absence' of evidence" that the father communicated to the mother "his willingness to support her emotionally or financially, or his commitment to raising his child," as well as the fact that father had not made a " 'significant effort[]' . . . to 'assume the mantle of responsibility for being a father.' " According to the court,

father's " 'laissez faire attitude' " was " 'very unusual' for a father who 'really wants to have his child and raise his child in his care.' " (*Id.* at p. 210.)  As with *Adoption of O.M.,* this situation involves a different scenario than that before us.  The basic point, however, remains the same:  a father must demonstrate early on his commitment to parenthood.  Andrew, like the father in *Adoption of A.S.,* failed to do so.

*Adoption of Myah M., supra,* 201 Cal.App.4th 1518 involved parents who were not "able or willing to take immediate custody" of their child two years after the grandparents had been granted guardianship of the child.  The father was denied *Kelsey S.* status solely on that ground, his parental rights were terminated, and the adoption by the grandparents was permitted to proceed.  (*Id.* at p. 1540.)  Here, the trial court relied on a variety of factors in reaching its conclusion.  *Myah M.,* therefore, is factually inapposite, and of no assistance to Andrew.

Andrew also relies on a case in which the court affirmed a *Kelsey S.* finding, *Adoption of H.R.* (2012) 205 Cal.App.4th 455 (*H.R.*) and attempts to draw an analogy between himself and the father in that case.  In *H.R.*, the trial court found father was a *Kelsey S.* father for a variety of reasons.  The father participated, as far as the mother would allow, during prenatal care.  He attempted to marry mother; their relationship was terminated by mother, who then blocked father from receiving any information on the yet-unborn minor.  "Father almost immediately sought the court's protection by filing an action to determine paternity and by obtaining DNA testing. . . . [¶] Father tried to live with mother and planned on marrying her.  They moved together to a two-bedroom apartment." (*Id.* at p. 468.)  Father furnished a room with a crib and changing table even though the child lived with the mother.  The evidence was uncontested that father maintained contact with the child as often as permitted, and that he and the child had actually bonded. (*Ibid.*)  On these facts, the court found that there was substantial evidence to support the trial judge's conclusion that father met the standards of a *Kelsey S.* father.  Here, in contrast, Andrew did not pursue his parental responsibilities to the extent the father in *H.R.* did.  His attendance at prenatal visits was perfunctory at best, his

16

actions toward Katherine were harmful, and he did not diligently pursue his parental rights.

The *H.R.* court also concluded that the alleged negative behavior of the father[13] did not prevent it from finding substantial evidence to support the trial court's judgment. The court pointed out that "[Father] never abandoned minor or waived his parental rights. He had no current drug, alcohol, or criminal conduct. While the trial court found father was controlling and domineering and viewed women as possessions, it made no factual findings of *any* hint of intended violence toward minor, and no factual findings of any actual violence toward mother. Tellingly, mother was unable to obtain a restraining order. Further, there was no evidence of *any* inappropriate behavior toward minor." (*H.R., supra,* 205 Cal.App.4th at pp. 469-470.) Further, in *H.R.*, the request for the restraining order had been denied for insufficient evidence and the court apparently disbelieved mother's testimony. (*Id.* at p. 459.) The situation here is quite different. There was considerable evidence that Andrew physically and emotionally abused Katherine, who did obtain a restraining order.

In an effort to dismiss the evidence that he was not emotionally supportive of Katherine, Andrew contends that Katherine "barely met her burden" when she obtained the domestic violence restraining order and the incidents on which the restraining order was based were "isolated." In such a situation, Andrew's remedy was to challenge the order on those grounds, something he did not do.

---

[13] For example, mother claimed father "engaged in angry outbursts, assaultive conduct, and sexually inappropriate conduct with a teenager." (*H.R., supra,* 205 Cal.App.4th at pp. 468-469.) The court was not persuaded that these actions undermined the substantial evidence supporting the trial court's finding regarding *Kelsey S.* status. The alleged "sexually inappropriate conduct" was the subject of testimony by mother's teenage daughter, who testified that father "once came in the computer room to thank her and kissed her neck; her response was 'ewww.' " (*Id.* at p. 468.) The mother's daughter also testified in response to a question from the trial court that she would support mother's position no matter what, and that her testimony was solely to support mother. The court found that the trial court did not rely on this evidence in its findings of fact; moreover, it did not appear that the trial court even credited this testimony. (*Id.* at p. 469.)

In his reply brief, Andrew relies on *Baby Boy W., supra,* 232 Cal.App.4th 438, a case in which the court found that substantial evidence supported the trial court's *Kelsey S.* finding based on numerous factors. Although Andrew contends that his behavior was similar to that of the *Baby Boy W.* father, he is incorrect. In *Baby Boy W.*, the court found that substantial evidence supported the trial court's *Kelsey S.* findings. Specifically, the father promptly attempted to assume parental responsibilities, and was willing and able to assume full custody of the child with the help of his family. The father moved across country to San Diego a week after learning of the child's birth and secured full time employment within a month after that. (*Id.* at p. 449.) He "provided adequate financial support commensurate with his ability to do so and with [mother's] need." (*Id.* at p. 456.) It was undisputed that the father took prompt legal action to secure paternity. He also offered sufficient emotional support to mother. (*Id.* at p. 461.) There was no evidence of violence or physical abuse. The mother "acknowledged that [father] never hit her, never threatened her, and never called her a bad name." (*Id.* at p. 460, fn. 19.) At most, mother testified that father yelled at her over the telephone when they argued about adoption. (*Ibid.*) Taken together, the facts in *Baby Boy W.* are wholly unlike the case before us, and led the trial court in that case to an entirely different conclusion that was supported by substantial evidence.

Andrew suggests that because the court in *Baby Boy W.* mentioned that the father unwittingly took certain actions that the mother found objectionable, Andrew's own good intentions in his actions toward Katherine should have been given some weight by the trial court. This argument is not persuasive. Contrary to Andrew's argument, the trial court in *Baby Boy W.* affirmatively stated in its findings that it treated the "issue of emotional support objectively." (*Baby Boy W., supra,* 232 Cal.App.4th at p. 458.) Further, the *Baby Boy W.* court did not announce a general rule that in considering a father's actions, a court should look solely to a father's motivations and intentions, but rather seemed to be observing that the father's sincerity and level of maturity had some bearing on the inferences the trial court drew about his actions. We will not disturb the trial court's findings here based on this argument.

18

**B.**     *Best Interests Finding*

"Where a natural father does not have presumed father status under section 7611 or a constitutional right to block an adoption under *Kelsey S.*, ' "the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]" ' " (*Adoption of A.S., supra,* 212 Cal.App.4th at p. 215.)

Section 7664, subdivision (b) provides that if the biological father claims parental rights, "the court shall determine if it is in the best interest of the child that the biological father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the biological father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child."

Section 7664, subdivision (c) provides that "If the court finds that it is in the best interest of the child that the biological father should be allowed to retain his parental rights, the court shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the biological father, or that if he is the biological father it is in the child's best interest that an adoption be allowed to proceed, the court shall order that the consent of that man is not required for an adoption. This finding terminates all parental rights and responsibilities with respect to the child."

It was Andrew's burden to prove that Emilio's best interest would be served by permitting Andrew to retain his parental rights and not allow the adoption to proceed. (*Adoption of A.S., supra,* 212 Cal.App.4th at p. 218.) "We must determine whether substantial evidence supported the trial courts findings and whether it abused its discretion in determining that it was in [the child's] best interests to terminate appellant's parental rights and proceed with the adoption." (*Id.* at p. 218.)

In reaching its decision that it was in Emilio's best interest to terminate Andrew's parental rights and allow the adoption to proceed, the trial court found that the adoptive parents "are loving parents with the capability to love and nurture Emilio and the ability to provide him a healthy childhood." The court relied on the observations of Dr.

19

Frederica Conrad, who "observed the interactions between the [G.'s.] and the child, and testified that the child is becoming attached to both parents, and that to remove Emilio from this loving couple would be harmful to Emilio." The court found that "[i]f the child were to be removed from the [G.'s], [Katherine] would seek custody of Emilio which would lead to a custody dispute between the parents, who have a previous domestic violence history and an uncomfortable relationship with each other, subjecting Emilio to tremendous stress." Finally, the court found that "[i]f Emilio stays in the home of the [G.'s], he will have access to both biological mother and father, while remaining in the care of two people who have demonstrated that they have the ability to care for and nurture Emilio."

Andrew does not appear to argue that these findings are not supported by substantial evidence.[14] Rather, he points to other evidence in the record of his suitability as a parent and contends that the court erred in concluding he had failed to meet his burden of showing that it would be in Emilio's best interests for him to retain his parental rights. He first asserts that he went to "extraordinary lengths" to obtain custody and loved his son and wanted to be a father to him. He also argues that any disruption to Emilio on moving him from the G.'s home could be avoided with a "smooth transition plan," and that one benefit of blocking the adoption would be the benefit to Emilio of being raised by his biological father. Andrew acknowledges the history between himself and Katherine but asserts that exposure to conflict could be minimized in the event he and Katherine have a custody dispute. Finally, he argues that the trial court should not have relied on the assertion of the G.'s that they would give both Katherine and Andrew access to Emilio.

---

[14] Andrew contends as an aside that the court was "premature" in stating that it would give more "credence" to the testimony of the psychologist who observed Emilio (Dr. Conrad) than that of the psychologist retained by Andrew (Dr. Singer) who did not observe Emilio because the court made this comment before hearing the testimony of Dr. Singer. He provides no authority that the court erred in making this observation. Further, there is no evidence that the court did not fully consider the testimony of witnesses in arriving at its conclusions.

20

We disagree that the trial court's discretionary decision should be disturbed for any of the reasons Andrew advances. With regard to his efforts to obtain custody, we note that the steps Andrew took occurred fairly late in a pregnancy he knew about much earlier. Of far more significance, however, is Andrew's attempt to minimize the conclusion of the G.'s expert witness, Dr. Conrad, an expert in attachment bonding and co-parenting. Dr. Conrad observed signs of bonding and attachment between Emilio and his adoptive parents, which she believed would continue. Dr. Conrad testified that the trauma of a move from the G.'s to another caretaker could be minimized. However, two important conditions under which that trauma could be minimized were not present here—namely a similarity between the G.'s and Andrew and the sensitivity and empathic response of Andrew to the child upon such a change. There is very little in the record to support Andrew's claim that he would provide the loving and supportive environment from which he proposes to remove Emilio. Andrew's history of emotional and physical abuse of Katherine, his criminal behavior, and failure to support Katherine emotionally or financially suggest the contrary would be the case. Similarly, Andrew dismisses the possibility that there will be any difficulty between himself and Katherine over custody of Emilio should the adoption not proceed. On this record, such a claim is untenable.

With regard to Andrew's argument that it was in Emilio's best interests to be raised by his biological father, this is only one of many factors a court may consider in making a discretionary decision regarding a child's best interests. (See *Adoption of A.S., supra,* 212 Cal.App.4th at p. 218.) It is not, however, the only factor, and on this record we cannot say that the trial court abused its discretion in giving it less weight than the considerable evidence that the adoption would be in Emilio's best interests and should be allowed to proceed.

Finally, we need not decide whether the trial court was precluded from considering the G.'s' expressed willingness to allow both Katherine and Andrew access to Emilio. Even if this factor was not one on which the court could rely, as Andrew argues, the trial court's decision was based on far more than this possibility.

21

In sum, the trial court court's findings of facts are supported by substantial evidence. We find no basis for concluding that the trial court abused its discretion in reaching its decision.

**C.** ***Oscar G.'s Presumed Father Status***

Andrew contends that the trial court improperly found that Emilio's adoptive father, Oscar G., qualified as his presumed father. The court's statement of decision, however, explicitly states that "deciding whether or not [Oscar G.] is Emilio's presumed father . . . is not necessary . . . ." Although the court went on to state that were it to be called on to determine whether Andrew or Oscar were Emilio's presumed father, Oscar would be the appropriate choice, this observation carried no weight in the court's ultimate decisions. Accordingly, no error occurred.

## DISPOSITION

The trial court's order is affirmed. Respondents are awarded their costs on appeal.

_____
Miller, J.

We concur:

_____
Kline, P. J.

_____
Stewart, J.

22