Filed 4/4/16  In re J.R. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. _____ <br><br> LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ANDRES M., <br><br> Defendant and Appellant. | B265354 <br><br> (Los Angeles County Super. Ct. No. CK92569) |

APPEAL from orders of the Superior Court of Los Angeles County, Stephen Marpet, Commissioner.  Affirmed.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

Alleged father Andres M. appeals from juvenile court orders terminating his parental rights and denying his request for a paternity test.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Detention

J.R., born in June 2011, is the child of Karla R. and an unknown father.  J.R. came to the attention of the Department of Children and Family Services (DCFS) in February 2012 when an anonymous caller reported that mother was emotionally and physically abusing J.R., and mother and maternal aunt were selling and using methamphetamines in J.R.'s presence.  Mother tested positive for methamphetamines on February 24 and March 7, 2012, and J.R. was detained on March 12, 2012.

At a detention hearing on March 15, 2012, the court found a prima facie case for detaining J.R.  Mother submitted a "Parentage Questionnaire" in which she stated under penalty of perjury that she believed J.R.'s father was Ruben C., who died February 3, 2011.  No father was identified on J.R.'s birth certificate.  The court found Ruben to be J.R.'s alleged father.

### II.

### Jurisdiction and Disposition

DCFS filed a juvenile dependency petition on J.R.'s behalf on March 15, 2012. As subsequently amended, the petition alleged jurisdiction pursuant to Welfare and Institutions Code section 300, subdivision (b),[1] because mother was a current user of amphetamines and methamphetamines, which rendered her incapable of providing regular care of J.R. and placed him at risk of harm.

On April 16, 2012, mother pled no contest to the allegations of the petition.  The court ordered mother to submit to weekly on-demand drug testing, to participate in a drug

---

[1]     All subsequent undesignated statutory references are to the Welfare and Institutions Code.

2

program, and to attend parent education and individual counseling. Mother was granted monitored visitation twice each week.

## III.

## Review

The six-month status review report, dated October 15, 2012, said J.R. was doing well in his foster placement, but mother was only minimally compliant with her family reunification plan. On October 24, 2012, the court ordered DCFS to continue to offer mother family reunification services.

On July 23, 2013, and again on September 17, 2013, the juvenile court ordered DCFS to continue to provide mother with family reunification services. On December 6, 2013, however, the court terminated mother's reunification services and set a section 366.26 hearing for April 8, 2014. That hearing subsequently was continued to July 8, 2014.

## IV.

## J.R.'s Placement in a Prospective Adoptive Home

J.R. was placed in the home of Mr. and Mrs. R. in early 2013. In 2014, the R.'s told DCFS they wished to adopt J.R., and an adoptive home study was complete by April 2014. J.R. was reported to have a close bond with his prospective adoptive parents and to get along well with his prospective adoptive siblings.

## V.

## Andres's Appearance and Request for a Paternity Test;
## Termination of Parental Rights

In a "Last Minute Information for the Court," DCFS said it had been contacted on June 16, 2014, by Andres M., who claimed to be J.R.'s father. Andres said he had been romantically involved with mother in 2010. DCFS further reported as follows: "Mr. [M.] reported that he was arrested and incarcerated in 11/2010 and was released in 12/2011. Mr. [M.] reported that he made contact with [mother] and she informed him that he was [J.R.]'s father. Mr. [M.] reported that he saw [J.R.] a few times before being arrested and incarcerated again in 03/2012. Mr. [M.] was released into Delancy Street, a

3

behavior modification program in 06/2012 and kicked out in 04/2013. In 04/2013 he entered Amitty Foundation, w[h]ere he remained until 03/2014. Mr. [M.] stated that he re-connected with [mother] via Facebook in 03/2013 and she did not tell him that [J.R.] was in foster care until this month. Mr. [M.] stated that he would be attending the July 8th hearing, asking to be acknowledged as [J.R.]'s father."

On July 8, 2014, Andres submitted a JV-505 Statement Regarding Parentage (JV-505). Andres checked box (4), which said, "I do not know if I am the parent of the child and I request blood or DNA testing to determine whether or not I am the biological parent." Andres did *not* check box (8), which says, "I believe I am the parent of the child and request that the court find that I am the presumed parent of the child." However, he stated he told family members he was J.R.'s father, had "visited [J.R.] a couple times in 2011" and once in 2014, gave mother "diapers and other necessities in the beginning," and gave J.R. money for his birthday in 2014.

Andres appeared on July 8 and told the court he believed he was J.R.'s father. The court then questioned mother as follows:

"The Court: You indicated back in March of 2012 that Ruben [C.] was the father.

"Mother: Yes.

"The Court: And you swore under penalty of perjury that you declared him to be the father of this child.

"Mother: Uh-huh.

"The Court: And I can show you the document [in which] . . . you swore that this was the only person who could be the father. Now why is this gentleman here?

"Mother: There's no D.N.A. test from him yet. We don't know if he's –

"The Court: But you told me and swore that the father was Ruben [C.].

"Mother: And that's who I think it is."

Mother's counsel stated that mother had been in a sexual relationship with Andres when J.R. was conceived, and she asked the court to appoint counsel for Andres and order a paternity test. The court refused: "First of all, this gentleman, at best, can be nothing more than an alleged father. Period. Even if he's the biological father, he's an

4

alleged father. He's never presented himself to court in the last two years. And there's no basis upon which I would grant any continuance or appoint counsel. There's no basis. He is an alleged father only and the statute doesn't even provide I should appoint counsel so I'm going forward." The court subsequently found by clear and convincing evidence that J.R. was likely to be adopted, and it terminated the parental rights of mother, Ruben, "and all other persons claiming to be the father, including any identity unknown father, to the child [J.R.]."

Andres then attempted to address the court; the court declined to hear from him, saying, "Sir, I don't need to hear from you."

## VI.

## Mother's and Andres's Appeals

Mother timely appealed from the July 8, 2014 order terminating parental rights. On March 27, 2015, we affirmed the order. Andres was not a party to that appeal.

Andres also timely appealed from the July 8, 2014 order. For reasons that are not clear from the record, the notice of appeal was not received by the Court of Appeal until July 13, 2015, more than a year after it was filed.

## DISCUSSION

## I.

## Andres Is Not Estopped from Raising Issues
## Addressed in Mother's Appeal

Preliminarily, we address Andres's contention that he is not estopped from raising issues addressed in mother's appeal. We agree. "The doctrine of issue preclusion prevents relitigation of issues already argued and decided. (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 89.) Among other requirements, the doctrine only applies where the identical issue was decided previously, *and the party against whom the earlier decision is asserted had a ' " 'full and fair' " ' opportunity to litigate the issue*." (*In re Y.R.* (2007) 152 Cal.App.4th 99, 110, italics added, disapproved on another ground in *In re S.B.* (2009) 46 Cal.4th 529, 537, fn. 5.)

As we have said, although Andres timely filed a notice of appeal in the superior court on July 8, 2014, the notice was not received by the Court of Appeal until July 13, *2015*, more than a year after it was filed with the superior court, and four months after we issued an opinion in mother's appeal. Therefore, through no fault of his own, Andres plainly has not had a full and fair opportunity to litigate the issues raised in this appeal. He is not precluded from doing so.

## II.

## The Juvenile Court Did Not Err by
## Terminating Andres's Parental Rights

### A. *No Error in Denying Andres Presumed Father Status.*

To have substantive rights in the dependency proceeding, Andres would have to have established that he is J.R.'s "presumed" father. A man is a presumed father if he comes within one of the categories set forth in Family Code section 7611: He married, or attempted to marry the child's mother, or "receive[d] the child into [his] home *and* openly [held] out the child as [his] natural child." (Fam. Code, § 7611, italics added; *In re J.H.*, *supra*, 198 Cal.App.4th at p. 644.) In a dependency proceeding, a presumed father is entitled to appointed counsel, custody (absent a finding of detriment), and a reunification plan. (*In re Kobe A*. (2007) 146 Cal.App.4th 1113, 1120.)

Despite having the opportunity to do so, Andres did not establish that he is J.R.'s presumed father. In his "Statement Regarding Parentage" (JV-505), Andres did not say that he had ever married or attempted to marry mother or lived with J.R. Indeed, by his own admission, his contact with J.R. was extremely limited: He stated that he told unidentified family members he was J.R.'s father, "visited [J.R.] a couple times in 2011" and once in 2014, gave mother "diapers and other necessities in the beginning," and gave J.R. "some money for his birthday" in 2014. Accordingly, while Andres arguably "h[eld] out the child as his natural child," he indisputably never "receive[d] the child into his home." (Fam. Code, § 7611, subd. (d).) He therefore cannot be J.R.'s presumed father.

Andres claims that had he been permitted to address the court at the termination hearing, he might have been able to elevate his status to presumed father. We do not

6

agree.  Neither in the trial court nor on appeal has Andres ever asserted that he married or attempted to marry mother or received J.R. into his home.  Absent such a showing, as a matter of law he could not have been found to be J.R.'s presumed father.

Andres also claims that had he been permitted to address the court at the termination hearing, he might have been able to achieve presumed father status as a "*Kelsey S.*" father.  (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).)  In *Kelsey S.*, the biological father had openly held out the child as his own, but was prevented by the mother from physically receiving the child into his home.  (*Id.* at p. 825.)  The California Supreme Court held that a biological father who wanted to take the child into his home, care for the child, and hold the child out as his own, but who was prevented from doing so by the mother's unilateral decisions, could qualify for the same parental rights as those afforded by statute to presumed fathers.  (*Ibid.*)

In deciding whether a father is a nonstatutory presumed father under *Kelsey S.*, "[a] court should consider all factors relevant to that determination."  (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)  "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent."  (*Id.* at p. 849.)  "The father's conduct both *before and after* the child's birth must be considered.  Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit.  In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.'  [Citation.]  A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child."  (*Ibid.*)

The undisputed facts of this case establish that Andres is not a *Kelsey S.* father.  Andres says mother told him he was J.R.'s father in late 2011—but by his own admission Andres provided no financial support for the child other than "diapers and other

7

necessities" in the first few months of J.R.'s life and birthday money in 2014. Further, although J.R. has been a dependent child since he was an infant, Andres waited nearly two and a half years to appear in the dependency action and request a paternity test. And even at this late date, Andres has not demonstrated a willingness to assume full custody of J.R. By no measure, then, did Andres " ' "promptly attempt to assume his parental responsibilities." ' " (*Adoption of Emilio G.* (2015) 235 Cal.App.4th 1133, 1144.)

Andres contends that he could not have more promptly assumed parental responsibilities because he was "incarcerated and then in rehabilitation programs." In other words, Andres says, he could not act as a parent to J.R., because of his own criminal behavior and use of illegal drugs, *not* because of mother's actions. It is well established that there is "[no] violation of equal protection or due process in holding an unwed father's own criminal activity against him when assessing whether he has met the criteria for *Kelsey S.* rights." (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 680.) Accordingly, Andres cannot achieve presumed father status as a *Kelsey S.* father.

> B.      *No Error in Terminating Parental Rights Without Determining Biological Parentage*

Andres contends that it was error for the juvenile court to terminate parental rights to J.R. without first determining J.R.'s biological parentage. Andres does not explain *why* he believes a determination of biological paternity is relevant to termination of parental rights—he simply asserts that if this court agrees that the juvenile court was required to make a biological parentage determination, we must reverse the order terminating parental rights "to put the parties back into the same position they would have been in had paternity testing been ordered." For the reasons that follow, Andres is wrong.

In dependency proceedings, courts distinguish between "alleged" and "biological" fathers. An alleged father is a man "who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) A

8

biological father "is one whose paternity is established, but who does not qualify as a presumed father." (*In re J.O.* (2009) 178 Cal.App.4th 139, 146.)

An alleged or biological father "has very limited rights" in a dependency proceeding. (*In re J.H.* (2011) 198 Cal.App.4th 635, 644.) He must be given notice and an opportunity to appear and attempt to change his paternity status, but he is not entitled to appointed counsel or custody of the child. (*In re Kobe A.*, *supra*, 146 Cal.App.4th at p. 1120.) He will not receive reunification services unless the court determines such services will benefit the child. (*In re J.H.*, at p. 644; § 361.5, subd. (a).)

Even if Andres were J.R.'s biological father, therefore, he would not have been entitled to appointed counsel or reunification services absent a juvenile court finding that such services would benefit J.R. (§ 361.5, subd. (a).) The juvenile court implicitly found that offering Andres reunification services would *not* benefit J.R., a finding that is supported by overwhelming evidence. Andres and J.R. have met only a handful of times—twice in 2011 and once in 2014—and have no relationship. Although Andres claims mother told him he was J.R.'s father *in late 2011*, he has provided no financial support for the child other than "diapers and other necessities" in the first few months of J.R.'s life and birthday money in 2014. Andres has been in and out of prison and is unlikely to be able to provide a stable home for J.R. And, granting Andres reunification services at this late date will likely disrupt J.R.'s adoptive placement, denying him a chance at permanency after nearly two and a half years in foster care. Thus, a finding that Andres is J.R.'s biological father would not have had any impact on the progress of this dependency proceeding or the eventual termination of parental rights.

For all of these reasons, granting Andres a paternity test or an opportunity to address the court at the termination hearing would not have had any impact on the progress of this dependency proceeding or the eventual termination of parental rights. We therefore affirm the order terminating parental rights.

9

## III.

## The Juvenile Court Did Not Err by Failing to Order a Paternity Test

Andres contends the juvenile court abused its discretion by failing to order a paternity test to determine whether he is J.R.'s biological father. We do not agree. Parental rights have been terminated, and we have concluded that there is no basis on which to reverse the order terminating parental rights. Thus, Andres has no rights to assert or interests to be protected even if his biological status were determined. Because we therefore cannot provide Andres any effective relief, the question of his biological status is academic only.

Andres relies on *In re B.C.* (2012) 205 Cal.App.4th 1306 for the proposition that the biological paternity of a dependent child should be determined if requested, even if the alleged parent making the request cannot elevate his status to presumed parent. *In re B.C.* is distinguishable. There, a section 366.26 hearing had not yet been held, and the reviewing court made clear that "this appeal is *not* from an order terminating parental rights." (*In re B.C.*, at p. 1314, fn. 4, italics added.) Here, the section 366.26 hearing has been held, parental rights have been terminated, and J.R. has been released for adoption. We see no reason to order a test to determine a child's potential biological link to a man whose parental rights to that child have already been terminated.

Andres urges, finally, that if he were determined to be J.R.'s biological father, DCFS could "consider his relatives as possible placements for" J.R. The issue is a theoretical one, as J.R. is already in an adoptive placement and, in any event, Andres has made no showing that he has any relatives who are able or willing to accept placement of J.R.

## DISPOSITION

The juvenile court's orders terminating parental rights and denying a paternity test are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                        EDMON, P. J.

We concur:



            ALDRICH, J.



            HOGUE, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.