Filed 3/29/24  P. v. Frazier CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097629 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE000092) |
| v. | |
| ISAIAH FRAZIER, | |
| Defendant and Appellant. | |

A jury found defendant Isaiah Frazier guilty of first degree murder and unlawfully possessing a firearm.  As to the murder, the jury found true the allegation that defendant discharged a firearm causing the victim's death.  The trial court later found true a prior strike allegation.  The trial court sentenced defendant to an aggregate term of 75 years to life in prison.  On appeal, defendant contends there was insufficient evidence to support the murder conviction.  We disagree and affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

This case centers upon a homicide by shooting. On appeal, defendant challenges the sufficiency of the evidence supporting the prosecution's sole theory and the jury's finding that defendant was guilty as the actual shooter as opposed to as an aider and abettor or coconspirator, which the jury was not instructed on. Given that defendant is challenging only the underlying theory for the murder conviction, we relay the facts with a focus thereon.

In the early morning hours of December 27, 2019, the victim was shot four times while waiting in a McDonald's drive-through. At the time, the victim was sitting in the front passenger seat of a burgundy car driven by his girlfriend, L.M. L.M.'s friend was one of the two other passengers in the burgundy car. Only the victim was shot, and he died from his wounds.

The shooting was recorded on a McDonald's surveillance system. The footage comprised of clips taken from various cameras stationed at different angles. The footage was played for the jury during defendant's trial; however, it was not included in the record on appeal. We have only the trial testimony of former Sacramento County Sheriff's Detective Glen Petree describing the footage.

Three minutes before the shooting, and approximately one-half mile from the McDonald's, two people were seen getting into a silver car registered to defendant's girlfriend. The silver car drove into the McDonald's shopping center just before the shooting. It is undisputed that defendant was one of the two people in the silver car. Defendant was known to drive the silver car.

After entering the shopping center, the silver car drove alongside the cars waiting in the McDonald's drive-through, headed toward the drive-through exit. The silver car stopped before the exit to the drive-through and reversed, stopping near the entrance to the drive-through. The driver got out of the driver's side door and walked to the passenger side of the silver car. Detective Petree believed the former driver got into the

2

passenger-side door, but this was not depicted in the surveillance footage due to the positioning of the cameras and the silver car. Detective Petree believed the former driver switched places with the unknown second person inside the car. The surveillance footage did not depict anyone enter the driver's side door nor any doors on the silver car open. The second passenger was not seen in the McDonald's footage.

The silver car drove forward again and stopped. The front passenger—wearing clothing matching those of the person previously seen leaving through the driver's side door—got out of the silver car and shot seven rounds toward where the victim sat in the burgundy car. The shooter wore a beanie, a tan jacket, a grey sweatshirt, sweatpants, and white and black shoes.

Within 24 hours of the shooting, the silver car was found at the apartment complex where defendant's brother lived. Defendant and defendant's girlfriend were found in the silver car after being seen entering and exiting defendant's brother's apartment. During a search of the apartment, officers found a gun with no fingerprints on it, which was later identified as the murder weapon. Defendant was taken into custody.

At the time of his arrest, defendant was wearing shoes like those the shooter wore. Several videos spanning the days leading up to the shooting and through the evening of defendant's arrest showed defendant wearing clothing similar to what the shooter wore. One video uploaded to the Internet four hours before the shooting showed defendant holding a firearm and wearing clothing similar to the shooter. These videos were played for the jury during defendant's trial. The videos were not included in the record on appeal; we have only testimony discussing their contents.

L.M. and her friend from the burgundy car were questioned by deputies at the sheriff's department a few hours after the shooting. At some point, L.M. and her friend were left alone in a video surveilled interrogation room. When alone together, L.M. reenacted the McDonald's shooting in front of her friend and said, "Klicko did it." Defendant was known to go by the moniker Klicko. L.M. also speculated to her friend

3

that defendant's girlfriend was the second passenger in the silver car. L.M. was unaware her discussion was being recorded and assumed the conversation was private. The recording was played for the jury during defendant's trial. The video was not included in the record on appeal; we have only testimony describing its contents.

At trial L.M. recanted her recorded statements to her friend, stating she did not see the shooter or the silver car and that, in the conversation with her friend, she was simply trying to figure out what happened during the shooting. During testimony, L.M. could not explain why she identified Klicko as the shooter nor why she assumed defendant's girlfriend was the other passenger in the shooter's car. L.M. said she was unable to clearly remember the shooting because she was drowsy and under the influence of Xanax at the time. Sacramento County Sheriff's Deputy Sean Woodward did not perceive L.M. as being drowsy or under the influence of Xanax when he questioned her after the shooting.

L.M. testified at trial she was aware of defendant's moniker and was very familiar with defendant, having lived in the same neighborhood. L.M. dated defendant before dating the victim. L.M. maintained contact with defendant after their breakup and exchanged calls and messages in the days leading up to and following the shooting. L.M. also visited defendant in jail after his arrest for the shooting.

Defendant associated with a gang from the neighborhood in which he and L.M. had lived. The victim associated with a gang from a different neighborhood. The two gangs were notorious rivals, resulting in countless shootings, beatings, and murders over the years.

Defendant's defense at trial was that the unknown second passenger in the silver car was responsible for the murder. Defendant argued his girlfriend was not the passenger; he argued the passenger was D.A. D.A.'s fingerprints were found along the outside of the passenger-side rear door of the silver car, cell tower data placed defendant's cell phone near D.A.'s home just before the shooting, and D.A. belonged to

4

the same gang as defendant. Cell tower data placed D.A.'s cell phone at his home during and after the shooting.

The jury found defendant guilty of murder in the first degree and unlawfully possessing a firearm. The jury also found true the allegation defendant discharged a firearm causing the victim's death, which was attached to his murder charge. The trial court found true a prior strike allegation and declined defendant's request to strike the prior strike. The trial court sentenced defendant to 25 years to life for the murder conviction, doubled pursuant to the "Three Strikes" law, and 25 years to life for the firearm enhancement, bringing the total sentence to 75 years to life in prison. The trial court further sentenced defendant to a concurrent term of two years, doubled pursuant to the Three Strikes law, for the firearm possession conviction.

Defendant appeals.

## DISCUSSION

Defendant contends insufficient evidence supports his conviction for murder based on the theory he was the shooter. Specifically, he argues the evidence supporting that theory was speculative and not sufficiently solid or credible. We disagree.

The sufficiency of the evidence review standard is well established. In the light most favorable to respondent, the appellate court must examine the sufficiency of the evidence supporting the fact finder's determination by conducting an independent review of the entire record for substantial evidence. (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270; *People v. Johnson* (1980) 26 Cal.3d 557, 577 [the review must be based upon the whole record, not simply isolated evidence taken out of context].) Substantial evidence is "evidence [that] is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Johnson*, at p. 578.) " 'In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . . "We resolve neither credibility issues nor evidentiary conflicts." ' " (*People v. Penunuri*

5

(2018) 5 Cal.5th 126, 142.) We ask whether " '*any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.' " (*Ibid.*) " 'The same standard governs in cases where the prosecution relies primarily on circumstantial evidence.' " (*Montanez*, at p. 271.)

The jury was instructed on defendant's murder liability as a direct perpetrator, not as an aider and abettor or coconspirator. To support this theory, the prosecution relied on the testimony and prior statements of L.M., the surveillance footage of the shooting, and videos of defendant wearing clothing similar to what the shooter wore in the surveillance footage. Together, this evidence cannot be understood as mere "isolated evidence," contrary to defendant's assertion. Even so, the video of the shooting and pictures of defendant provided the jury with an opportunity to visually compare the characteristics of the shooter with those of defendant to determine for itself whether defendant was the shooter. We have not been provided with the recording of the shooting nor the photographs of defendant in clothing similar to that worn by the shooter. As a consequence, we are in no position to second-guess the jury's determination based on that evidence. (See *Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 644 ["Where the appellant fails to provide an adequate record of the challenged proceedings, we must presume that the appealed judgment or order is correct, and on that basis, affirm"].)

Defendant further argues there was no direct evidence establishing he was the shooter. This is incorrect. " '[D]irect evidence' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (Evid. Code, § 410; cf. *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 329 [purported eyewitness testimony about what they saw is direct evidence].) The evidence contained a video recording from just hours after the shooting in which L.M. acted out the shooting and stated defendant "did it." This is a statement from an eyewitness who sat within arm's reach of the victim when he was shot. This

constitutes direct evidence and is generally sufficient to uphold a conviction. (See *People v. Montanez*, *supra*, 91 Cal.App.5th at p. 271 [a conviction may be supported by testimony from a single witness].)

Defendant attacks the substantive value of, and therefore the jury's possible reliance on, L.M.'s statement that defendant "did it." He does so by arguing that L.M.'s in-court repudiation of the statement was more credible, that she could not see the shooter, and that she did not see the car he came from. These arguments are unpersuasive. Defendant's beliefs regarding the witness's credibility are immaterial because that determination rests squarely with the trier of fact. (*People v. Penunuri*, *supra*, 5 Cal.5th at p. 142; *People v. Ozene* (1972) 27 Cal.App.3d 905, 910 ["It is blackletter law that any conflict or contradiction in the evidence, or any inconsistency in the testimony of witnesses must be resolved by the trier of fact who is the sole judge of the credibility of the witnesses"].) It is not in the appellate court's domain to second-guess the fact finder's determinations related to credibility issues or evidentiary conflicts unless the testimony is impossible or inherently improbable. (Cf. *Penunuri*, at p. 142; *Gonzales v. California Victim Compensation Bd.* (2023) 98 Cal.App.5th 427, 448 [unless testimony is impossible or inherently improbable, such determinations are "unreviewable"].) Defendant has failed to make such a showing.

A reasonable jury could have decided L.M.'s repeated evasiveness and contradictions while testifying marked her untrustworthy in court. For example, she regularly did not provide substantive answers, including to foundational background questions, and instead responded with "I don't know" or "I don't remember." This included when she was asked about where she was at the time of the shooting, what neighborhood she grew up in and how long she lived there, how long she had known defendant, and whether she had ever dated him. Indeed, the trial court stepped in on multiple occasions to remind L.M. of her obligations to the court, including to advise her, "We're not here to play games," and to keep in mind that lies are perjury. Additionally,

7

Sacramento Police Sergeant Joseph Ellis explained that persons associated with gang members adhere to a no "snitching" rule that dictates they not "cooperate with the police"—even to help resolve a shooting by a rival gang member. The record thus contains solid evidence from which a reasonable fact finder could have rationally found L.M. was lying during testimony when she stated she did not see the shooter.

Further, just after the shooting, L.M. told her friend defendant "did it" when she believed she was not being surveilled. Yet, at trial, she said she did not see the shooter because she was looking away from the victim and then ducked her head down at the time of the shooting. In the context of the case as a whole, especially given L.M.'s familiarity with defendant and his girlfriend, L.M.'s acting out the shooting to her friend, and L.M.'s specific identification of defendant as the shooter, we conclude that it is not impossible nor inherently improbable for a fact finder to reasonably find L.M. was able to see the shooter and the car from which the shooter exited.

Regardless, defendant's assertion regarding the lack of direct evidence of defendant's guilt is irrelevant. As the jury was instructed with CALCRIM No. 223, "Facts may be proved by direct or circumstantial evidence or by a combination of both. [¶] . . . [¶] Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other." (Cf. *People v. Livingston* (2012) 53 Cal.4th 1145, 1165-1166 [agreeing with several decisions concluding CALJIC No. 2.00, the predecessor to CALCRIM No. 223, accurately states the law].) Thus, the jury was permitted to base its determination of defendant's guilt on indirect evidence alone.

Indeed, a jury could reasonably deduce defendant's guilt as the shooter based upon the indirect evidence presented throughout the entire record. (*People v. Mumin* (2023) 15 Cal.5th 176, 202 [a jury is authorized to make logical and reasonable deductions from

8

evidence].)  Deductions made by the jury may not be mere speculation, as defendant points out.  (*People v. Raley* (1992) 2 Cal.4th 870, 891 [reasonable inferences must be drawn from the evidence and not mere guesswork, speculation, or suspicion].)  As discussed, the jury heard a plethora of evidence tying defendant to the act of shooting the victim.  Defendant was one of just two persons in the silver car, defendant was seen wearing clothing matching that of the shooter in the days leading up to the shooting, hours before the shooting defendant published a video of himself holding a gun and wearing clothes similar to those the shooter wore, and the gun used in the shooting was found in defendant's brother's apartment the evening following the shooting just after defendant was seen leaving the apartment.  A rational trier of fact could reasonably find, based upon the above evidence and not mere speculation or guesswork, that defendant was the shooter beyond a reasonable doubt.

Lastly, defendant's claims the evidence pointed to D.A. as the shooter are unavailing.  While the evidence may be interpreted to support an inference D.A. was the shooter, that is but one theory and it is not the place of this court to choose one interpretation of the facts over another.  (See *People v. Montanez*, *supra*, 91 Cal.App.5th at p. 271 [we presume " 'the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial,' " and reverse only where no hypothesis whatsoever provides sufficient evidence to support the jury's verdict].)  The role of this court is to " 'determine if there is any substantial evidence, contradicted or not, [that] will support the conclusion of the trier of fact.' " (*Adoption of Emilio G.* (2015) 235 Cal.App.4th 1133, 1145.)  We have determined reasonable, credible, and solid evidence supports the jury's factual findings.

Accordingly, we conclude there was sufficient evidence to support the murder conviction.

9

# DISPOSITION

The judgment is affirmed.


/s/
ROBIE, J.


We concur:


/s/
EARL, P. J.


/s/
MESIWALA, J.

10